**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION**

| | | |
|---|---|---|
| ERICA CHANEY, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO.: |
| | ) | 4:11-cv-142-CDL |
| v. | ) | |
| | ) | |
| TAYLOR COUNTY SCHOOL DISTRICT, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |

---

**BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

Plaintiff, Erica Chaney, filed her complaint alleging that she was terminated from employment as a Family Service Assistant ("assistant") in a federal grant program known as the Safe Schools/Healthy Students Initiative (hereafter "SS/HS initiative" or "SS/HS program") operated in Taylor County, Georgia in retaliation for exercising her rights under (1) Title IX of the Education Act Amendments of 1972, 20 U.S.C. § 1681, (2) Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, 42 U.S.C. §§ 1981 and 1983, and (3) Georgia's Whistleblower Act, O.C.G.A. § 45-1-4.  She named as Defendants the Taylor County School District (hereafter "TCSD" or "School District"), Wayne Smith, the School District's Superintendent, Rufus (Rod) Green, Project Director for the SS/HS initiative, and Cicero Latimore, a mental health therapist employed by the initiative.  For the reasons discussed below, Defendants contend that there are no material issues of disputed fact and this Court may enter summary judgment in their favor.

**STATEMENT OF THE FACTS**

**I.      The Safe Schools/Healthy Students Initiative Grant**

In 2008, the Executive Director of the Taylor County Family Matters Collaborative began the process of applying for grant funds available through the SS/HS initiative, a federal program

supported through the United States Departments of Education, Justice, and Health and Human Services, authorized by 20 U.S.C. § 7131.[1]  The purpose of the grant was to implement an integrated, comprehensive community-wide plan to create safe and drug-free schools and promote healthy childhood development.  The target issues the initiative intended to address were violence, including bullying, alcohol, tobacco and drug abuse, social and emotional learning, parent education and social support for families. The funds were to be used to deliver, among a myriad of services, research-based prevention curriculum, peer mediation programs, family case management services, school based mental health therapy services, substance abuse early intervention programs, behavioral intervention services, intensive family therapy and support group services, school based mentoring programs, support groups, and student wellness teams.  [SMF ##1-4].

The grant was awarded for four years[2] with the Taylor County Board of Education serving as the "fiscal agent" of the grant monies, but the program was governed by a Memorandum of Agreement signed by representatives of the School District, the local juvenile justice agency, the local law enforcement agency, and the local public mental health authority, which were required grant "partners."  Each partner designated a "senior representative" to sit on the "Core Management Team" ("CMT") which was charged with implementation of and oversight of the program.  [SMF ##5-7].

Decisions regarding the employment of individuals to staff the SS/HS initiative were made by the CMT.  This contrasts with the process of hiring teachers and other staff employed by local public school systems; those employees must be recommended for employment by the local school district's superintendent to the local board of education, pursuant to O.C.G.A. § 20-2-211.  The day-to-day operation of the grant was managed by a Project Director, who, once hired by the CMT,

---

[1] The Collaborative is part of and receives funding from the Georgia Family Connection Partnership.  See http://www.gafcp.org/index.php.
[2] The grant was extended for a fifth year but with no additional funding.

made recommendations to the CMT for hiring and firing staff.   The superintendent only participated in personnel decisions as one of the members of the CMT.  No local county or state of Georgia funds were used to pay any part of the grant employees' salary or benefits or to pay for any other expenses of the grant program.  [SMF ##8-11].

## II.        Implementation of the Grant

Once the grant was awarded, the CMT began the process of staffing the program.  The grant called for a Project Director, two Mental Health Therapists, two Family Service Assistants who functioned as social workers, two employees to deliver the research-based curricula in the classroom, and one employee to provide parent education services.  None of the positions in the grant program required a Georgia teaching certification.  [SMF ##12-13].

Three employees relevant to this case were hired at the inception of the grant.  The CMT first selected Defendant Green, an African American male,[3] as the Project Director in August 2008. Green has a B.S. in Criminal Justice and Masters degree in Public Administration from Columbus State University and, at the time, had been serving for approximately three years as a site coordinator at Taylor County High School for another grant administered by the Family Matters Collaborative entitled 21st Century Community Learning Centers.  That grant, also federally funded but awarded through the Georgia Department of Education, provided funds for establishing learning centers operating outside of regular school hours for academic enrichment and tutoring to students in high poverty and low-performing schools and for literacy and educational development programs to those students' families.  [SMF ##14-17].

Upon the recommendation of Green, the CMT selected Defendant Latimore, an African American male, as one of the Mental Health Therapists (hereafter "therapists").  Latimore had been serving as a member of the Taylor County of Board Education and had been employed for over

---

[3] The race of the staff is relevant given Plaintiff's allegations that she complained that African American students were being discriminated against by the staff on the basis of race.

twenty-five years in various private and public mental health counseling settings.  Latimore has a Bachelors degree in Economics and Business Administration and a Masters degree in Vocational Rehabilitation Counseling, both from Fort Valley State University, and is licensed by the Georgia Composite Board of Medical Examiners as a Licensed Professional Counselor ("LPC").   He was assigned primarily to counsel students in the middle and high schools.  The CMT hired Dory Bernard, a white female, as the other mental health therapist.  Bernard has a B.S. in Psychology from Black Hills State University and two Masters Degrees from Southwestern Baptist Theological Seminary, one in Marriage and Family Counseling and the other in Christian Education.  She had been working for three years as a social services specialist for the Taylor County Department of Family and Children Services ("DFACS").  She was assigned to work with students at the primary and elementary schools.  But both Latimore and Bernard counseled students of all ages depending on the specific needs of the students.  [SMF ##18-24, 26].

Two Family Service Assistants (hereafter, "assistants") were selected: Valerie Harris, a Caucasian female, who was assigned to the middle and high schools, and Rhonda Tabor, an African American female, who was assigned to the elementary and primary schools.    Both had previously worked at Taylor County DFACS.  [SMF ##27-28].

The grant also called for an independent evaluator who was responsible for regular monitoring of the operation of the grant.  Carol Norris Consulting, Inc. served in this capacity. [SMF #30].  One of the primary ways the evaluator monitored the grant was by reviewing data submitted by the assistants and therapists of their contacts with and about students in the program. Assistants submitted data on written forms, while therapists submitted data in a computerized format.  This process is discussed in further detail below in connection with the assessment of Plaintiff's performance and the decision to terminate her employment.

### III.      Plaintiff's Employment

In early 2010, the assistant who was working with primary and elementary school students resigned.  Plaintiff, an African American female, applied for the position and submitted a resume that showed she had a Bachelors degree in Criminal Justice from Fort Valley State University and that she was a "candidate" for a Masters degree in Criminal Justice at Boston University.[4]  She had no education or training in mental health counseling[5] and, therefore, was not expected nor authorized to provide those services to students.   She had five sporadic years of social work experience, working in five different settings, including three different DFACS offices.  [SMF ##49-50, 52, 54].

Hired to replace the assistant at the primary and elementary schools, Plaintiff would necessarily be working closely with Bernard.  The respective roles of the assistant and therapist are important to understand.  Referral to the SS/HS program began with completion of a form given to the assistant that asked for a description of the reason for the referral.  The assistant, in the role of social worker, made the initial assessment of what services the student needed and whether they could be provided by the program or whether a referral to services in the community was required. The assistant could determine that the program's after-school tutoring, mentoring, peer mediation or other services were appropriate.   If the student needed mental health counseling or therapy, the assistant would refer the student to the therapist.  Identification of students who were in need of mental health counseling was a major component of the grant.  Because the assistant was the initial point of contact for students referred to the program, it was essential for the assistant to communicate effectively with the therapist, to inform the therapist of the potential need for

---

[4] During discovery in this lawsuit, Defendants obtained Plaintiff's records from Boston University that showed she had been dismissed from the program in 2007 and had obtained only 8 hours of credit for the 28 hours she attempted.  [SMF #51].
[5] Plaintiff represented on an application for employment prior to the position in the SS/HS program that she was a degree candidate in Clinical Psychology at Capella University.  Those records show that she enrolled in 6 courses from fall of 2008 to fall of 2009, attempting 30 hours of credit but withdrawing from every course, earning no credit at all.  [SMF #53].

counseling, and once in counseling, to keep the therapist informed of the student's activities in the program, the student's progress in the classroom, his or her discipline status and any other information the assistant learned about the student through her contact with the student.  Once a student was referred to the program, the assistant was responsible for continuing communication with the student's parents and monitoring and logging the activities the student participated in, as well the contacts the assistant had with the student, his teachers, and his parents.  [SMF ##31-40, 55].

Both Plaintiff and Bernard agree that their relationship did not start well.  Bernard got the impression that Plaintiff questioned her judgment and was proposing strategies for counseling students as though she were supervising Bernard's work.  In fact, Plaintiff did appear to believe that Bernard was racially insensitive and incapable of counseling African American students.  The other African American members of the SS/HS staff did not concur with that opinion.   Bernard's supervising therapist, Latimore, who regularly consulted with her and reviewed her documentation, found no evidence of discrimination against African American students.  Nor had Green observed that Bernard was discriminating against African American students.  [SMF ##56-63].

By August of 2010, the relationship between Bernard and Plaintiff had deteriorated so significantly that Plaintiff asked for permission to move her office from the primary school to the elementary school so she no longer shared an office with Bernard.  On August 11, 2010, Green arranged for Latimore and his assistant, Harris, to meet with Bernard and Plaintiff to offer suggestions, based on their own positive working relationship, as to how Plaintiff and Bernard should handle the process of communicating about students in the program, as well as the proper roles of the therapist and the assistant with regard to those students in counseling.   This meeting was extremely contentious and produced an angry and defensive letter from Plaintiff to Green and the meeting participants objecting to what she characterized as "frivolous accusations" about her

attendance, failure to meet the responsibilities of her job, and unwillingness or inability to communicate effectively with Bernard.  The meeting and letter were prime examples of her inability to establish, much less maintain, positive relationships with her colleagues.   Upon receipt of this letter, Bernard began keeping a log of her contacts with Plaintiff, both in-person meetings, as well as by telephone and e-mail.  [SMF ##64-67, 70].

Not surprisingly, given Plaintiff's reaction to the meeting, the relationship between Bernard and Plaintiff did not improve and on August 17th, Green met with them and issued an oral reprimand to both.  In the meantime, Plaintiff began actively pursuing employment elsewhere, notifying Green in September that an employer in Florida would be calling him for a reference and that she needed to go to Florida to finalize the arrangements.  On September 16, 2012, Green informed the CMT at its monthly meeting that there would likely be a vacancy in one of the assistant positions and they would need to start the process of recruiting and advertising for the position.  That same week Plaintiff told Bernard that her last day of employment would be September 24, 2010.  [SMF ##68-69, 72-74].

Upon her return from Florida, Plaintiff  emailed Green that she needed to meet with him right away and demanded that he make a training program available to her immediately at a cost of several thousand dollars.   When Green expressed reservations about spending the money to train her given her expressed interest in leaving the program, Plaintiff became extremely angry.   But in a meeting with Bernard on September 22, 2010, which Plaintiff surreptitiously recorded for some unknown reason, she suggested that Green was angry with her because Bernard had told him and other staff members that Plaintiff's employment would end on September 24th.   Plaintiff insisted in that recorded conversation that she had told Bernard only that she "might" take the new position.[6]  [SMF

---

[6] Just hours after that meeting with Bernard, Plaintiff fired off the complaint to the Georgia Professional Standards Commission which is the focus of the lawsuit and in it accused Green of numerous ethical violations which are discussed in more detail below.

##75-78].

It was obvious to Green that Plaintiff and Bernard could not work cooperatively together. Therefore, in a staff meeting on September 28, 2010, he announced his decision to reassign Plaintiff to work at the middle and high schools with Latimore, and Valerie Harris to work at the primary and elementary schools with Bernard. Latimore's experience with Plaintiff was not dissimilar to Bernard's. He found her difficult to work with, combative and uncooperative. [SMF ##79-80, 90, 93].

On September 27, 2010, the Professional Standards Commission ("PSC") faxed to Defendant Smith a copy of the September 22nd complaint Plaintiff had made against Green.[7] One of the accusations of concern to Smith was that Green at one time had a teaching certificate that had been revoked. Smith was not aware of the revoked certificate because the positions Green held in both the SS/HS and 21st Century Community Learning Centers grants were not teaching positions that required any kind of certification. It was necessary, therefore, to determine from the PSC whether there was any impediment to allowing Green to continue to work in the SS/HS program. Accordingly, shortly after receiving the PSC complaint, Smith asked Green not to come back to work until the matter could be resolved with the PSC.[8] [SMF ##81-86].

After sending her complaint to the PSC, Plaintiff's performance deteriorated even further. Her relationship with Latimore soured; she even sent him an e-mail acknowledging an "unpleasant" confrontation with him. She began sending emails objecting to signing in and

---

[7] On that same date, Plaintiff contacted the United States Department of Education Inspector General ("IG") through its "hotline." In January of 2011, the IG's office contacted the School District's fiscal officer and informed her that it had opened an investigation into complaints made by Erica Chaney. This was the first notice the School District received that in addition to the complaint to the PSC, Plaintiff had made a complaint to the federal government. Investigators from the IG's office conducted interviews with numerous SS/HS employees on January 20, 2011. On March 4, 2011, the IG's office notified Smith that it had concluded it lacked jurisdiction because American Recovery and Reinvestment Act funds were not involved. [SMF ##166-169].

[8] Green did not return to work until March 1, 2011 when the PSC website showed that his certificate status was "expired" rather than "revoked." At that point, the CMT decided he could be reinstated as Project Director. [SMF #87].

providing information related to her many absences to Green's administrative assistant.  She sent emails demanding a job description, an employee handbook, and to be told who her supervisor was in Green's absence.  She missed several days of work despite being told that important meetings were scheduled for those days.  She claimed she was "ill" but never provided medical documentation.  As it turned out, her "illness" was related to the job.  She failed to turn in her time sheets and had to be asked to do so three times.  [SMF #90].

Most significantly, Plaintiff was unable or unwilling to provide on a timely basis the forms and data which she was responsible for submitting to Norris Consulting.  A brief description of the forms and procedures is critical to understanding the central importance of this deficiency in Plaintiff's performance.  [SMF #95].

Each assistant was required to enter information on a form entitled "Individual Service Record" ("ISR") of every contact the assistant had with a student or the student's parent or any contact she had with other agencies or teachers about the student.  Every student enrolled in the program was supposed to have an ISR and those forms were turned into the consulting firm on a quarterly basis.  The assistants were also required to complete on a quarterly basis a form that documented their individual activities and accomplishments during the quarter, including participation in staff development and training programs.  Over the eight months Plaintiff was employed, she completed and turned in only nine ISRs and they show minimal contact with the students in the program or their families.  This contrasted significantly with the quantity and quality of the ISRs that the other assistant, Valerie Harris, regularly submitted.   The four other worksheets Plaintiff submitted were virtually blank.  [SMF ##41-48, 90].

For all of the above reasons, when Smith requested Latimore serve as interim Project Director in Green's absence, Latimore decided to suspend Plaintiff.  He asked her to come in to talk with him about how she could meet his expectations, but she refused to do so, continuing to

claim a medical absence even though she never provided any documentation.  Before making his recommendation to the CMT to terminate her employment, Latimore asked both Harris and Bernard to provide him in writing with a description of their experience with Plaintiff.  Both confirmed how confrontational and difficult she was as a colleague.  Accordingly, he decided to recommend to the CMT that she be terminated which he did at a meeting on November 9, 2010 during which he laid out his reasons for doing so.  [SMF ##89-97].

At the time Latimore made the decisions and recommendations regarding Plaintiff's employment, he had never seen Plaintiff's complaint to the PSC nor had he been told its contents. He was unaware that Plaintiff's complaint or any of her actions had anything to do with Green's suspension when he made his recommendations.  He did not discuss his decision with Green.  He told Smith that he was going to make the recommendation to the CMT.  Smith agreed and voted with the CMT to approve that recommendation.  [SMF ##98-99].

**IV.    The Substance of the Complaint to the PSC**

As previously indicated, Plaintiff's complaint to the PSC contained numerous accusations about Green's conduct.  They addressed three general subjects: Green's certification status and criminal history; Green's alleged failure to report to law enforcement sexual activity on a school bus among students allegedly required by O.C.G.A. §19-7-5, Georgia's Child Abuse Reporting Statute; and Green's alleged knowledge that African American students were not receiving timely or adequate mental health counseling in the SS/HS program because of their race.

A.   Green's Certification Status and Criminal History

As indicated previously, Smith was unaware that Green had a "revoked" teaching certification.  He was well aware, however, of the criminal history.

Prior to employment in the 21st Century grant, Green served in the Americus Police Department as a narcotics investigator for five years and as a special agent in the GBI for four

years.  He resigned from the GBI in May 2004, the day after he closed numerous investigative files by placing required paperwork in them which he had falsified.   Over a year later, in May 2005, he was notified by a lawyer from the Attorney General's office that a criminal investigation had been conducted and that he would be indicted for those actions.  Green immediately agreed to plead guilty.  Despite the lawyer's request for a significant prison sentence, the superior court judge sentenced Green to ten years probation under Georgia's First Offender Act, O.C.G.A. § 42-8-60, 500 hours of community service, and a $6,250 fine.[9]  This information was well known to the members of the Taylor County Family Collaborative in August 2005, when Green was hired to the position in the 21st Century Community Learning Centers program, as well as to the members of the SS/HS CMT when they selected him for the position of Project Director three years later.[10] Nothing prohibited the Collaborative or the CMT from making the decision to employ Green under those known circumstances.  [SMF ##156-160, 162].

　　B.  <u>Allegations of Discrimination Against African American Students</u>

　　　　According to Plaintiff, shortly after beginning employment, she discussed with Green her contention that Bernard was not providing adequate or timely service to students on the basis of race.   Green had never received any complaints from Latimore, who was supervising Bernard's practice, or the administrators with whom she had been working.   Moreover, Green had been working with Bernard for over a year, had observed no such discrimination and had not received similar complaints from the previous African American assistant whom Plaintiff replaced.  Nor

---

[9] Green satisfied all the terms of this sentence and was discharged from probation on July 27, 2012, three years early.  Plaintiff's assertion in her PSC complaint that he was a "convicted" felon was manifestly false.  [SMF #161].

[10] In the year prior to notice that he would be indicted, Green worked from October 2004 to May 2005 in the Macon County School District at its alternative school.  He did so under a temporary "waiver" of teaching certification requested by that School District's superintendent to the PSC).  When the superintendent notified the PSC of Green's guilty plea in May 2005, the PSC initiated the process of revoking his temporary certification waiver which had, by then, already expired.   Because none of the positions Green held in the two Taylor County grants required PSC certification, the prior existence or status of a teaching certification did not come up as it was not relevant to his selection to either position. [SMF ##163-165].

had any parents of students in the program complained.  From Green's perspective, Plaintiff's complaints about Bernard were based on her apparent belief that she was more competent than Bernard and more deserving of Bernard's job.  [SMF ##59-62, 100].

Plaintiff acknowledged that she never made any complaints to Smith or Latimore about Bernard's counseling of African American students.  [SMF #63].

Plaintiff's primary complaint about Bernard's practices revolves around the "waiting list" for services.  She contends that more African American students were on the "list" than white students.  Her only example of this was two white students related to the local police chief. Bernard began counseling those children immediately after they witnessed an extremely violent episode of domestic violence in their home.  Plaintiff contends that these children received counseling even though two African American students who were victims of abuse in the home were not.  At her deposition, Bernard explained that at the time the white students were referred for counseling, no one had referred the African American students to her.  Importantly, Plaintiff's own ISR on one of these students shows no referral to Bernard for counseling. As a matter of fact, Bernard did not receive a referral to counsel either of the African American students until well after Plaintiff's employment was terminated.  In the end though, no one contests that because of the volume of referrals, students were waiting to receive Bernard's services and she had to prioritize based on presenting problem.  But the students waiting were both black and white.  [SMF ##100-109].

In addition to the "waiting list," Plaintiff pointed to a six year old African American male student, S.S., who accused Bernard of favoring a white female student during a group therapy session.  Plaintiff objected to Bernard's reaction to the boy's allegation which Plaintiff claimed was to propose dismissing him from counseling.  In fact, Bernard discussed the student' behavior with Latimore and told him she believed the student was using the allegation to manipulate her.  He

suggested that counseling be discontinued.  Nevertheless, Bernard decided to continue counseling him.  [SMF ##110-113].

Plaintiff also objected to Bernard recommending to the parent of an African American female student that she be evaluated by a pediatrician in addition to participating in the counseling Bernard offered.  It is not clear how this reflects that Bernard discriminated against that student.  [SMF ##114-115].

In reality, Plaintiff's complaints about Bernard were not premised so much on her view that Bernard was discriminating against African American students as they were that Plaintiff was more qualified for Bernard's position, particularly when it came to counseling African American students.  This is abundantly clear from the inclusion in her list of objections to Bernard that a white parent asked that her child be counseled by Latimore.  Plaintiff's alleged "advocacy" on behalf of African American students was advocacy on her own behalf.  [SMF #116].

### C.   Student Sexual Misconduct

Some of the most inflammatory allegations in Plaintiff's lawsuit relate to an incident of sexual activity among a female student and two male students who were participating in a summer camp at Fort Valley State University ("FVSU").[11]  There is considerable dispute about the details of the incident which involved a fourteen year old female student who performed oral sex on two boys, one also fourteen, and the other sixteen, while riding a school bus.  There is also dispute about what the female student told Plaintiff, Green and employees at the university about the incident.  But the following facts are **not** in dispute and they demonstrate that Plaintiff's complaint

---

[11] The most outrageous allegation in Plaintiff's Complaint is her assertion that Green abusively interrogated the student.  Interestingly, Plaintiff did not make that allegation in her complaint to the PSC nor did she report this alleged conduct to anyone at the time.  And, importantly, the FVSU professor who was present when this alleged "interrogation" occurred failed to support Plaintiff's accusation.

to the PSC had nothing to do with "advocacy" on behalf of the female student, but everything to do with her real objective which was to ensure that Green lost his position in the SS/HS program:

- **Plaintiff did not report the incident to law enforcement or DFACS,** despite her insistence now that it was vital to do so to protect the female student; [SMF #154]

- The Director of the FVSU infirmary, a registered nurse, did not report the incident to law enforcement or DFACS; [SMF #124]

- The FVSU professor in charge of the summer program did not report the incident to law enforcement or DFACS. [SMF #155].

In fact, the **only** person who made a report to either law enforcement or DFACS was Green who reported it the day after he learned of it to the Taylor County Sheriff, Jeff Watson.  [SMF #142].

Furthermore, there is no dispute that Green informed the female student's mother of the incident and that she asked that the boys not get "in trouble" because her daughter told her she had participated voluntarily.  It is undisputed as well that the mother asked Green whether her daughter could receive mental health counseling and that he, in turn, initiated that process, requesting Latimore to contact her.  There is no dispute that Latimore did so, that the mother executed the forms and permissions for her to be evaluated and to receive counseling, that she attended the psychosocial assessment Latimore conducted with her daughter, and that that student was subsequently provided with that counseling on a regular basis.  Finally, it is undisputed that the male students were suspended from the camp, that one of them was provided with counseling related to the incident on the bus, but the other male student's parent refused permission for counseling.  [SMF ##136-141, 143-147, 150].

The details of this incident are not relevant to the grounds on which Defendants move for summary judgment.  Nevertheless, because Plaintiff will, no doubt, argue that they are central to

her claim of retaliation, the facts recounting those details are available in Defendants' Statement of Undisputed Material Facts.  [SMF #117-155].

## STANDARD OF REVIEW

Rule 56(a) of the Federal Rules of Civil Procedure permits the entry of summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Because the Plaintiff, the non-movant, will bear the burden of proof at trial, the School District in this motion need show the Court only that there is an absence of evidence to support the Plaintiff's case—that is, the evidence is insufficient to establish an essential element of the Plaintiff's case.  Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548 (1986); see also Fitzpatrick v. City of Atlanta, 2 F.3d 1112 (11th Cir. 1993).

Once the moving party discharges its burden of identifying the basis of its contention of a right to judgment as a matter of law, the nonmoving party must present specific evidence of a material issue of fact or that the moving party is not otherwise entitled to judgment as a matter of law.  477 U.S. at 324-326.  The Eleventh Circuit has stated that the district court "need not permit a case to go to a jury, however, when the inferences that are drawn from the evidence, and upon which the non-movant relies, are 'implausible.'"  Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 743 (11th Cir. 1996).  In addition, "[s]peculation does not create a genuine issue of fact."  Howard v. Or. Television, Inc., 276 Fed. Appx 940, 941 (11th Cir. 2008).

The Eleventh Circuit has clarified the role summary judgment may play in job discrimination cases.  In Chapman v. AI Transport, 229 F.3d 1012 (11th Cir. 2000), the court, sitting en banc, specifically abrogated a line of prior cases which had suggested that summary judgment is not an appropriate means of resolving employment discrimination claims where motive and intent are in issue.  The court stated, "[t]he long and short of it is that the summary

judgment rule applies in job discrimination cases just as in other cases.  No thumb is to be placed on either side of the scale." Id. at 1026.

## ARGUMENT AND CITATION OF AUTHORITY

### I.    Introduction

Plaintiff's Complaint is framed in three counts: Count One for a violation of Title IX of the Education Act Amendments of 1972, 20 U.S.C. § 1681; Count Two for a violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, and 42 U.S.C. § 1981, and Count Three for violation of Georgia's Whistleblower Act, O.C.G.A. § 45-1-4. In addition, the Complaint makes one vague reference to the First Amendment.  Defendants address first the three named counts and then show in the last section that Plaintiff's Complaint fails to state a First Amendment claim, but in the event Plaintiff attempts to argue that it does, such a claim also would fail.

### II.    Count I – Title IX Retaliation

In Count One of her Complaint, Plaintiff contends that the "Defendant District"[12] violated Title IX when it allegedly retaliated against her for her "actions on behalf of" the female student involved in the sexual incident on the bus. [Complaint ¶¶ 58-59].  In Jackson v. Birmingham Bd. of Educ., 544 U.S. 167 (2005), the United States Supreme Court recognized an implied cause of action for retaliation under Title IX, holding that retaliation is a form of intentional discrimination prohibited by Title IX.  The Court defined retaliation to be "discrimination 'on the basis of sex' because it is an intentional response to the nature of the complaint: an allegation of sex discrimination." Id. at 172.  The Eleventh Circuit has recently

---

[12] Plaintiff appears to recognize in ¶ 59 of the Complaint that only the School District, rather than the individually named employees, can be liable for violations of Title IX.  See Williams v. Bd. of Regents of Univ. Sys. of Ga., 477 F.3d 1282, 1300 (11th Cir. 2007) (citing Hartley v. Parnell, 193 F.3d 1263, 1270 (11th Cir.1999)); Shotz v. City of Plantation, Fla., 344 F.3d 1161, 1170 n. 12 (11th Cir. 2003)(neither Title VI nor Title IX recognize individual liability); Greenwell v. Univ. of Ala. Bd. of Trs., 7:11-CV-2313-RDP, 2012 WL 3637768 (N.D. Ala. Aug. 22, 2012) ("individuals cannot be sued under Title IX under any capacity")(italics in original).
.

determined that the same framework for analyzing Title VII retaliation claims should apply to Title IX retaliation claims.  Bowers v. Bd. of Regents of Univ. Sys. Of Ga., 12-12244, 2013 WL 563180 *3 n. 7 (11th Cir. Feb. 15, 2013).

Because there certainly is no direct evidence of retaliation, the Plaintiff must proceed using the familiar framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) and Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981).  See also Mayfield v. Hart Cnty. Sch. Dist., No. 3:04-cv-09 (CDL), 2006 WL 1652299 *7 (M.D.Ga. June 9, 2006) (setting forth elements of Title VII retaliation claim).  First, she must establish a *prima facie* case of retaliation.  If she is able to do so, the burden of production shifts to the Defendants to articulate a legitimate, non-discriminatory or non-retaliatory reason for the employment decision. In order to carry its burden of production, a "defendant need not persuade the court that it was actually motivated by the proffered reasons. . . . It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff."  Burdine, 450 U.S. at 254.  If the defendants satisfy this burden of production – which has been described as "exceedingly light" – then the **plaintiff** must prove by a preponderance of the evidence that the defendants' asserted reason was "pretext" for discriminatory animus.  Id. at 254-256; Cooper v. S. Co., 390 F.3d 695 (11th Cir. 2004), overruled on other grounds, Ash v. Tyson Foods, Inc., 546 U.S. 454 (2006).

To establish a *prima facie* case of retaliation under Title IX, Plaintiff must show that (1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) a causal link existed between the two events.  Bowers *3 citing Burlington N. & Santa Fe Ry. v. White, 548 U.S. 53 (2006).  As for the first element, in Title VII employment discrimination retaliation cases, to establish that a plaintiff engaged in statutorily protected expression, the plaintiff must show that she "had a good faith, reasonable belief that the

employer was engaged in unlawful employment practices." <u>Weeks v. Harden Mfg. Corp.</u>, 291 F.3d 1307, 1311-12 (11th Cir. 2002), quoting <u>Little v. United Tech., Carrier Transicold Div.</u>, 103 F.3d 956, 960 (11th Cir.1997).  Adapting this element to Title IX retaliation cases, a plaintiff must show that she had a good faith, reasonable belief that a violation of Title IX occurred, that is, that a student was discriminated against on the basis of sex.  Moreover, there is both a subjective and objective component to this standard described in the Title VII context as follows:

> A plaintiff must not only show that he *subjectively* (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his belief was *objectively* reasonable in light of the facts and record presented. It thus is not enough for a plaintiff to allege that his belief in this regard was honest and bona fide; the allegations and record must also indicate that the belief, though perhaps mistaken, was objectively reasonable.

<u>Id</u>.

In this case, Defendants contend no violation of Title IX occurred[13] and that Plaintiff could not have objectively believed it had when she made the report to the PSC.  Presumably she will argue that the Title IX violation occurred when Green allegedly failed to report the incident on the bus to law enforcement as Georgia law arguably requires. Defendants are not aware of any cases that hold that a failure to comply with state law reporting requirements relating to sexual activity is a violation of Title IX.  But even if it were, Plaintiff cannot show that she subjectively believed that Green had not reported it nor that such a belief would have been objectively reasonable.  She did not act in subjective good faith when she made this allegation in her complaint to the PSC **two months** after she and Green learned of it because she made **no**

---

[13] Of course, in order to violate Title IX, the incident itself had to involve an act of sexual harassment of the female student by the other students.  <u>See</u> <u>Davis v. Monroe Cnty Bd. of Educ.</u>, 526 U.S. 629, 642 (1999).  Voluntary sexual activity among teenagers, while perhaps illegal under state law and certainly not condoned, does not violate Title IX. Defendants question whether Plaintiff even subjectively believed that the student was the victim of a "sexual assault" as she characterizes it in this lawsuit.  If that is what she believed, why didn't she report it herself to either law enforcement or DFACS?

attempt whatsoever to determine whether it was true.[14]  She did not bother to ask Green again after their initial discussion about reporting the incident the day they both learned of it.  Most importantly, she did not bother to ask any law enforcement official—the very officials to whom she claimed in her PSC report the matter should have been reported—whether a report had been received.  Specifically, she did not ask the Sheriff who was a member of the CMT that supervised her employment.  Certainly a reasonable person would have inquired prior to making the accusation and, therefore, her belief was not objectively reasonable either.  In reality, Plaintiff's report to the PSC had nothing to do with protecting or speaking out on behalf of the student and everything to do with personally attacking her supervisor.

Plaintiff certainly suffered an adverse employment action when Latimore suspended her and then subsequently recommended to the CMT that her employment be terminated.  But Plaintiff cannot establish a causal link between her PSC report and the employment decisions.  It is undisputed that Latimore had never seen or been told about the contents of her report to the PSC.  In fact, he did not know she had made a report to the PSC at the time he made those decisions.  Latimore did not even know that Plaintiff had, at any time throughout her employment, accused Green of failing to report the incident.  Needless to say, where the decision maker is unaware of the "protected activity," there can be no causal link.  Goldsmith v. City of Atmore, 996 F.2d 1155, 1163 (11th Cir. 1993)("At a minimum, a plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took adverse employment action."); see also Mayfield, *9.

---

[14] This failure to make the slightest effort to verify her accusations before making them is a pattern.  She alleged in this lawsuit that the female student did not receive counseling; and she contends that she was "advocating" on behalf of this student in order to ensure that she received counseling.  But she admits that she never bothered to ask Latimore whether the student had been referred for counseling or whether he was providing it.  She could have easily verified it because once Plaintiff transferred to work as Latimore's assistant, he gave her the list and schedule of students he was counseling and the student's name was on it. Moreover, after she traded positions with Valerie Harris, she had access to all the records on the female student, including the referral for counseling and the ISR Harris completed.

Defendants contend, therefore, that Plaintiff cannot even establish a *prima facie* case of retaliation.  But assuming she has, as in Title VII cases, the burden shifts to Defendants to come forward with legitimate nonretaliatory reasons for the adverse employment decisions.  Those reasons are set forth in detail in the Statement of Undisputed Material Facts.  They include Plaintiff's inability to get along with her colleagues, including one of the school counselors, the other Family Service Assistant, the mental health therapist with whom it was essential that she work closely and collaboratively, and finally, her supervisors, both Green and Latimore.  But the most telling evidence that supports Latimore's decision, and is referenced in the minutes of the CMT meeting where he explained the decision, is her failure to perform her job competently as reflected in the lack of paperwork she submitted that should have shown extensive contact with the students and families referred to the SS/HS program, but did not.  A simple comparison of the written data she submitted to the evaluator over the course of her employment with that submitted by Valerie Harris, her counterpart at the middle and high school, demonstrates either that she failed to document her efforts with the students and families as her job and the grant itself required, or she did not have even the minimal contact with the program participants that she was expected to have.

At this point, Plaintiff can defeat summary judgment in this Count only by "creating a question of fact as to whether the Defendants' reason is merely pretext for discrimination."  Presumably, Plaintiff will argue that she was performing her job competently and that she did not have the interpersonal difficulties that her colleagues recount.  But it is axiomatic in Title VII cases that plaintiffs may not prove that the employer's legitimate nondiscriminatory reason for the decision was pretextual by asking the court to "reexamine" business decisions, "to second-guess" business judgments, <u>Davis v. Town of Lake Park, Fla.</u>, 245 F.3d 1232, 1242, 1244 (11th Cir. 2001), quoting <u>Combs v. Plantation Patterns</u>, 106 F.3d 1519, 1543 (11th Cir. 1997), or to

determine whether employment decisions are "prudent or fair."  <u>Damon v. Fleming</u>
<u>Supermarkets of Fla., Inc.</u>, 196 F.3d 1354, 1361 (11th Cir. 1999).  <u>See also</u> <u>Alvarez v. Royal Atl.</u>
<u>Developers, Inc.</u>, 610 F.3d 1253, 1266 (11th Cir. 2010)(court does not "sit as a super-personnel
department" to "second-guess the wisdom of an employer's business decisions," because the
"wisdom of them is irrelevant-as long as those decisions were not made with a discriminatory
motive."  But it bears repeating that the Court in <u>Alvarez</u> said, in affirming summary judgment
for the employer, "**the fact that [plaintiff] thinks more highly of her performance than her**
**employer does is beside the point.  The inquiry into pretext centers on the employer's**
**beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside**
**of the decision maker's head.**"  <u>Id</u>. at 1266 (emphasis added).  In other words, Plaintiff's
"belief" that she was the perfect employee is **irrelevant** to proof of pretext, even at the summary
judgment stage**.**  She must come forward with evidence to show that the employer does not
actually believe the reasons it has advanced in support of its decision.  The record is entirely
bereft of such evidence.

Plaintiff was not retaliated against for any conduct associated with Title IX and,
therefore, the School District is entitled to summary judgment on Count I of Plaintiff's
Complaint.

### III.    Count II – Title VI and 42 U.S.C. §§ 1981 and 1983 Retaliation

In Count Two of her Complaint, Plaintiff contends that she was retaliated against for her
"actions on behalf of" African American students who were allegedly denied counseling services
because of race.  She brings this claim pursuant to Title VI of the Civil Rights Act of 1964, 42
U.S.C. § 2000d, which prohibits discrimination on the basis of race in programs receiving federal
financial assistance.  Like Title IX retaliation claims, Title VI retaliation claims are governed by

the Title VII analytical framework discussed above because Titles IX and VI are construed *in pari materia*. See Bowers 2013 WL 563180 *3 n. 8, citing Shotz, 344 F.3d at 1170 n. 12.

Plaintiff asserts this same claim not only under Title VI but also 42 U.S.C. § 1981[15] which prohibits discrimination in the making and enforcing of contracts and has been interpreted to provide a cause of action for retaliation. CBOCS West, Inc. v. Humphries, 553 U.S. 442 (2008). But Plaintiff 's allegedly protected expression does not relate to her or any other individual's employment relationship with the School District. It addresses the services provided to **students**. Defendants have been unable to locate any case that authorizes a cause of action under § 1981 under these circumstances. In fact, the only authority found is to the contrary. In Evans v. Kansas City, Mo. Sch. Dist., 65 F.3d 98 (8th Cir. 1995), a teacher objected to a principal's plans for implementing a desegregation order, contending that the plans discriminated against African American students. The Eighth Circuit refused to recognize his claims for wrongful termination under either Title VII or § 1981. The court explained first that the teacher's "opposition" was not to an "unlawful employment practice" under Title VII and, therefore, was not expression protected by Title VII. Then, acknowledging that § 1981 "is broader and encompasses actions that do not fall within the rubric of the employment relationship," the court nevertheless held that the teacher was not "the proper plaintiff to bring such an action on behalf of the students. The rights of the student body in such a situation must be asserted by an individual whose rights are directly affected by the challenged action, i.e., a student or parent of a student." Id. at 100-01.[16] In other words, the teacher did not have standing under § 1981.

---

[15] At least in the Eleventh Circuit, § 1981 claims against state actors, as here, must be brought through § 1983 as Plaintiff has done. Bryant v. Jones, 575 F.3d 1281, 1288, n.1 (11th Cir. 2009).

[16] See also Comans v. Scott Cnty. Sch. Dist., CIV.A.306CV505HTWLRA, 2010 WL 1780205 (S.D. Miss. Apr. 30, 2010)( retaliation claim based on complaint of discrimination against student not actionable under Title VII).

Even assuming the existence of a claim under § 1981 for expression about students, the analytic framework applied to retaliation claims brought under § 1981 (and § 1983) is again Title VII.[17]  Thus, for both her Title VI and § 1981 retaliation claims, Plaintiff must establish a *prima facie* case and, if she can do so, Defendants must come forward with legitimate, nonretaliatory reasons for which Plaintiff has no evidence of pretext.  Obviously, the discussion in the previous section of the nonretaliatory reasons Plaintiff was terminated is applicable to the Title VI (and § 1981) claim and Defendants will not repeat it here. Instead, they address here whether Plaintiff has made out a *prima facie* case.

As best Defendants can discern, the Title VI protected activity Plaintiff claims to have engaged in is complaining to Green that Bernard was discriminating against African American students by putting them on a waiting list for her services while providing counseling to white students.  Defendants question whether Plaintiff complained about Bernard because she believed in good faith that Bernard was discriminating against black students or rather because Plaintiff believed that she would be more competent to counsel black students than Bernard.  Her failure to notify Latimore of her professed concern undermines a good faith belief that Bernard was discriminating against black students.  She was aware that Latimore was supervising Bernard's counseling practices for purposes of her application for licensure as an LPC.  If she was, in fact, advocating on behalf of those students, why would she not bring this concern to the African American man who was supervising Bernard and who could evaluate the quality of her work?

Furthermore, Plaintiff has produced no evidence that it would have been objectively reasonable for anyone to believe that black students were being discriminated against.  A waiting list for counseling services that contained both white and black students without any evidence at

---

[17] Since the analysis of Title VI and § 1981 retaliation claims both uses the Title VII framework, whether the claim proceeds under § 1981 or Title VI is significant only on the issue of the liability of the individually named Defendants.  As noted above, individuals cannot be liable for violations of Title VI.  <u>Supra</u> n.12.

all of a disparity in numbers signifies nothing other than the tremendous need for counseling across racial lines.

Plaintiff's evidence of a causal nexus is nonexistent.  She testified unequivocally that she never brought this matter to the attention of Latimore.  Although Latimore was well aware of the acrimony between Bernard and Plaintiff, he was unaware that Plaintiff had complained about her services to African American students at the time he made the decision to suspend and then terminate her.  Green was the only person she spoke to about this alleged concern but he did not participate in the employment decisions.  Finally, there is no evidence that Smith was aware of any such complaints.

As noted in the standard of review, the Eleventh Circuit in Mize v. Jefferson City Bd. of Educ., has made it clear that this Court need not draw "implausible" inferences from facts in the record.  It is not entirely clear what "facts" Plaintiff has to support a causal nexus in any case.  But it is implausible in the extreme that Latimore or Green, two African American males, working in a program designed to benefit the large African American student community in Taylor County, would object to being given information about race discrimination and then retaliate against an African American female for doing so.

## IV.    Count III – Georgia's Whistleblower Act, O.C.G.A.§ 45-1-4.

In Count III of the Complaint, Plaintiff contends that she was retaliated against by her employer[18] for "disclosing a violation of or noncompliance with a law, rule, or regulation" which is protected conduct under Georgia's Whistleblower Act, O.C.G.A. § 45-1-4.  As a preliminary matter, this Court should note that in considering whether the Act operated as a waiver of Georgia's constitutional provision of sovereign immunity to state and local governments, the

---

[18] The Act does not authorize a cause of action against individuals in their "personal" capacities.  Jones v. Bd. of Regents, 262 Ga.App. 75 (2003).

Georgia Court of Appeals has held that the protection of the statute only applies "to situations where the public employer receives complaints from the public employee concerning **waste, fraud, and abuse** relating to **state programs and operations** under the jurisdiction of the public employer." Fulton Cnty. v. Colon, 316 Ga.App. 883 (2012)(emphasis added). The court went on to explain that the sovereign immunity of the **county** was waived by the Act,

> **only** to the extent that [the employees'] complaints related to a **state-funded program or operation** under the jurisdiction of the County. This construes the statute to provide that the state programs or operations under County jurisdiction must be **funded at least in part by the state** but need not be of state origin.

Id. at 889 (emphasis added).  In this case, however, there is no dispute that no state funds were used in the operation of the Safe Schools/Healthy Students program.  All of the funds came from the federal government.  Defendants contend, therefore, that the Plaintiff may not assert protection under this Act.

But assuming that the Act applies to the federal grant program at issue here, Plaintiff's claim fails on the merits.  The Georgia Court of Appeals has recently addressed the standard for analyzing claims arising under the Whistleblower Act presented at summary judgment.  Forrester v. Ga. Dep't of Human Servs., 308 Ga.App. 716 (2011).  The Court explicitly adopted the McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), burden-shifting framework applied in Title VII retaliation cases discussed above.  As in Title VII cases, to succeed with claims brought pursuant to O.C.G.A. § 45-1-4(d)(2):

> (1)[t]he plaintiff must establish a prima facie case of retaliation by a preponderance of the evidence; (2) if a prima facie case is established by the plaintiff, the employer must, nevertheless, articulate a legitimate, non-retaliatory reason for the adverse employment action taken; and (3) when such a reason is given by the employer, the plaintiff must demonstrate that the stated reason for the employer's adverse action is pretextual.

Forrester at 722.  In order to establish a *prima facie* case of retaliation, again the Court looked to Title VII cases, stating that the plaintiff must present evidence of the following four elements:

> (1)[t]he employer falls under the statute's definition of "public employer"; (2) the employee disclosed "a violation of or noncompliance with a law, rule, or regulation to either a supervisor or government agency"; (3) the employee was then discharged, suspended, demoted or suffered some other adverse employment decision by the public employer; and (4) there is some causal relation between (2) and (3).

Id.

With regard to the second element of the *prima facie* case, Defendants assume that the violations of the law and regulations Plaintiff contends she disclosed that are protected under the Act are the alleged violations of Title IX and VI, as well as the alleged failure to make a report under Georgia's Child Abuse Reporting Statute, O.C.G.A. § 19-7-5, and revocation of Green's teaching certificate.  Of course, O.C.G.A. § 45-1-4(d) disqualifies from protection any disclosure made "with knowledge that the disclosure was false or **with reckless disregard** for its truth or falsity." For the reasons discussed in the previous two sections, Defendants contend that the only disclosure that was not made with at least reckless disregard for its truth or falsity relates to the status of Green's certificate.  Having had a waiver to teach which was revoked and working as the Project Director in a program not requiring a teaching certificate at all arguably violates one of the PSC's ethical rules.  But violation of that rule does not relate to the "waste, fraud or abuse" that the Act is intended to address.   Thus, disclosure of the certification status is not protected under the Act.

Plaintiff cannot establish a *prima facie* case for an additional reason: lack of causation. Defendants have already shown that the decision maker—Latimore—was unaware of the report Plaintiff made to the PSC, unaware of her alleged complaints about race discrimination, and unaware that she alleged to anyone that a report to law enforcement about the incident on the bus had not been made.

Finally, for all the reasons detailed in Section II above, Defendants have demonstrated the legitimate nonretaliatory reasons for the decision to terminate her employment for which

Plaintiff can offer no evidence of pretext.  Defendants urge the Court to address this state law claim even if it grants summary judgment to Defendants on the federal claims because the relevant facts and substantive Title VII law applicable to the Whistleblower claim are identical to those applicable to both federal claims which also rely on Title VII jurisprudence.  Defendants should not be put to the expense of relitigating the identical claims related to a federal grant program which has ended and cannot reemploy the Plaintiff in any event.

### V.      The First Amendment

Although the complaint in this case references 42 U.S.C. § 1983 and the First Amendment, it does so only in paragraph 1 relating to **jurisdiction**.  Nowhere else in the complaint is there a reference to the First Amendment or any language suggesting that one of Plaintiff's **substantive** claims rests on the First Amendment.  Section 1983 is mentioned only once in the body of the complaint in paragraph 64.  There Plaintiff relies on § 1983 as the **legal** conduit through which her 42 U.S.C. § 1981 **race discrimination** claim is brought against the individual defendants.  Because none of Plaintiff's three counts is framed in terms of the First Amendment or includes any factual allegations which would plausibly support such a claim, her complaint fails to state a cause of action for a First Amendment violation.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)("[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."); Bowers v. Bd. of Regents of Univ. Sys. of Ga., 12-12244, 2013 WL 563180 *1 and *3 (11th Cir. Feb. 15, 2013)("Factual allegations [in a complaint] must be enough to raise a right to relief above the speculative level," quoting Bell Atl. Corp. v Twombly, 550 U.S. 544, 555 (2007). They must also "meet the 'plausibility standard' set forth in _Twombly_ and _Iqbal_."). When a complaint is deficient under Twombly and Iqbal, as is the case here, a plaintiff cannot overcome the deficiency by supplementing the facts in response to a summary judgment motion.

The proper procedure is to seek leave to amend the complaint as provided under Rule 15(a) of the Federal Rules of Civil Procedure – a step not undertaken by the Plaintiff.  Flintlock Constr. Servs., LLC. v. Well-Come Holdings, LLC, Nos. 11–13275, 11–14885, 2013 WL 673156, *4-5 (11th Cir. Feb. 26, 2013); GeorgiaCarry.Org, Inc. v. Georgia, 687 F.3d 1244, 1258 (11th Cir. 2012).

Even if the complaint could be construed to state a First Amendment claim, that claim is barred under Garcetti v. Ceballos, 547 U.S. 410 (2006).  All of the issues raised by Plaintiff relate to her employment and to the legal qualifications, competence and integrity of co-workers and supervisors.  As an employee of the Safe Schools/Healthy Students program, she was under the same duty as all other employees to assure that no child – black or white – was subject to racially discriminatory treatment.  Similarly, she was under the same duty as all other employees to report any sexual abuse of any child in the program.  O.C.G.A. § 19-7-5.  When Plaintiff voiced the complaints at issue in this case, she did so as an employee, not as a citizen, and she directed her complaints about the workplace against specific individuals, each of whom was a co-worker in the program.  Moreover, in writing the September 22, 2010 letter to the PSC, she communicated with the agency in Georgia that determines the qualifications of all educators in the state and possesses the authority to remove any person from an administrative or teaching position in any school in the state.  There are many cases in the Eleventh Circuit and elsewhere supporting the proposition that Plaintiff's complaints are not protected under the First Amendment. See, e.g., Brown v. Sch. Bd. of Orange Cnty., 459 Fed.Appx. 817, 820 (11th Cir. 2012)(school employee complained to board's employee relations department about storage and handling of hazardous waste in connection with performance of his job; held **not** a matter of public concern under Garcetti.); Abdur-Rahman v. Walker, 567 F.3d 1278, 1285-86 (11th Cir. 2009)(county inspectors reported county's alleged non-compliance with Clean Water Act;

reports held not matter of public concern because inspector's reports "owed [their] existence to the performance of their official responsibilities. . . ."); Battle v. Bd. of Regents for Ga., 468 F.3d 755, 760-62  (11th Cir. 2006)(reports of fraud on part of plaintiff's supervisor to university administrator which turned out to be substantiated held not matter of public concern under Garcetti; issue was whether plaintiff "was speaking pursuant to an official duty, not whether that duty was part of the employee's everyday job functions.").  See also Myles v. Richmond Cnty. Bd. of Educ., 2007 WL 2453588, *9 (S.D. Ga. August 22, 2007)(report by plaintiff to PSC held to be an affirmative duty on the part of plaintiff who was an educator; thus under Garcetti, plaintiff spoke as educator, not as citizen), aff'd 267 Fed.Appx. 898 (11th Cir. 2008)(purpose of speech was to further employee's private interest in promotion). .

Finally, the individual Defendants would be entitled to qualified immunity because it is not clearly established how the Garcetti analysis would apply to Plaintiff's complaints about her co-workers and supervisors so as to put these Defendants on notice that their conduct violated the First Amendment.  See Harlow v. Fitzgerald, 457 U.S. 800 (1982). Anderson v. Creighton, 483 U.S. 635, 640 (1987);  Akins v. Fulton Cnty., 278 Fed.Appx. 964 (11th Cir. 2008); Martin v. Baugh, 141 F.3d 1417 (11th Cir. 1998).

## CONCLUSION

Plaintiff's complaint to the PSC was little more than a disgruntled employee's attack on her supervisor.  Her attempt to repackage it after-the-fact as civil rights advocacy should not be permitted.  For all the reasons discussed herein, Defendants—the Taylor County School District and the Defendants named in their individual capacities—respectfully request that their Motion for Summary Judgment be granted.

Respectfully submitted this 15th day of April, 2013.

**HARBEN, HARTLEY & HAWKINS, LLP**

*s/Martha M. Pearson*
Martha M. Pearson
Georgia Bar No. 569375
Phillip L. Hartley
Georgia Bar No. 333987

Wells Fargo Center, Suite 750
340 Jesse Jewell Parkway          ATTORNEYS FOR DEFENDANTS
Gainesville, GA 30501             TAYLOR COUNTY SCHOOL DISTRICT,
Telephone: (770) 534-7341         WAYNE SMITH, RUFUS CULLEN GREEN
Facsimile:  (770) 532-0399        AND CICERO LATIMORE
E-Mail:      phartley@hhhlawyers.com
             mpearson@hhhlawyers.com

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

ERICA CHANEY,                          )
                                       )
    Plaintiff,                     )      CIVIL ACTION NO.:
                                       )      4:11-CV-142-CDL
v.                                     )
                                       )
TAYLOR COUNTY SCHOOL                   )
DISTRICT, *et al.*,                    )
                                       )
    Defendants.                    )
                                       )

## CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of April, 2013, I electronically filed the *Brief in Support of Defendants' Motion for Summary Judgment* with the Clerk of Court using the CM/ECF system which will automatically send e-mail notification of such filing to the following attorneys of record:

      Matthew C. Billips - billips@bandblawyers.com
      Meredith J. Carter - carter@bandblawyers.com


               **HARBEN, HARTLEY & HAWKINS, LLP**


               *s/Martha M. Pearson*

Wells Fargo Center, Suite 750     Martha M. Pearson
340 Jesse Jewell Parkway        Georgia Bar No. 569375
Gainesville, Georgia 30501
Telephone: (770) 534-7341        ATTORNEY FOR DEFENDANTS
Facsimile:  (770) 532-0399         TAYLOR COUNTY SCHOOL DISTRICT,
                             WAYNE SMITH, RUFUS CULLEN GREEN
                             AND CICERO LATIMORE