**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**COLUMBUS DIVISION**

| | | |
|---|---|---|
| ERICA CHANEY, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO.: |
| | ) | 4:11-cv-142-CDL |
| v. | ) | |
| | ) | |
| TAYLOR COUNTY SCHOOL DISTRICT, | ) | JURY TRIAL DEMANDED |
| WAYNE SMITH, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

---

**PLAINTIFF'S RESPONSE TO DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**

I.      STATEMENT OF FACTS

Plaintiff incorporates herein her responses to Defendants' Statement of Undisputed Material Facts and her Statement of Material Facts Showing A Genuine Issue for Trial, as if fully set forth herein.

II.     ARGUMENT AND CITATION OF AUTHORITY

A.      Plaintiff's Claim For Retaliation Under Title IX Survives Summary Judgment

The Supreme Court has recognized an implied private right of action to enforce Title IX, codified at 20 U.S.C. § 1681 and 42 U.S.C. Section 2000d-7. *Cannon v. Univ. of Chi.*, 441 U.S. 677, 99 S.Ct. 1946, 1958-60, 60 L. Ed. 2d 560 (1979). The Court has also recognized a claim for retaliation for employees who attempt to enforce or complain about violations of Title IX. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 125 S.Ct. 1497, 1502, 161 L. Ed. 2d 361 (2005).. To establish a prima facie case of disparate treatment under Title IX, Chaney must show that show that (1) she engaged in statutorily protected expression; (2) Defendants took action that would have been materially adverse to a reasonable employee; and (3) a causal link existed between the

two events. See *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 126 S.Ct. 2405, 2415, 165 L. Ed. 2d 345 (2006); *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001).

      1.      Plaintiff engaged in statutorily protected expression

Defendants contend that there was no violation of Title IX nor could Plaintiff have reasonably believed that there was a violation of Title IX.  In this case, the facts of this case show clearly that Ms. Chaney's belief that a Title IX violation occurred was reasonable, as it was correct.

The basis for her belief that a violation of Title IX occurred begins with the forcible sodomy of a 14 year old girl, L.M., by two male students on a Taylor school bus, during a period that they were being transported as part of a federally funded grant program and supervised by Taylor County employees.  The forcible sodomy of L.M. occurred while Cicero Latimore was supervising the bus, but he claims not to have noticed.  (Green Dep., p. 80; Latimore Dep., p. 93).  This, although Latimore claimed that, when he served as bus monitor, he would sit in the middle of the bus so as to keep an eye on all of the students on the bus.  (Latimore Dep., pp. 130-131).

Ms. Chaney subsequently learned that one of the students involved, D.B., had a prior incident in which he molested a 12 year old girl.  (Latimore Dep., pp. 102-1103).  Defendants attempt to suggest that Mr. Latimore was unaware of the student, D.B.'s, prior history of sexual molestation, by asserting that he had not seen particular documents.  However, Mr. Latimore testified that he was aware of D.B.'s history.because D.B. told him about it during a counseling session.  (Latimore Dep., pp. 99-106).  Latimore took no additional precautions regarding D.B. during his participation in this program.  (Id).  Further, Ms. Chaney testified that Latimore told her about D.B.'s prior history, after the bus incident, which is how she was first made aware of it.

In *Williams v. Bd. of Regents*, 477 F.3d 1282, 1295 (11th Cir. 2007), the Eleventh Circuit held that the fact that University of Georgia administrators were aware that a student had been

guilty of a prior act of sexual harassment prior to him attending UGA – yet had taken no protective measures regarding this student -- was sufficient to show discrimination in violation of Title IX when he subsequently sexually harassed a UGA student.   Thus, this case is on all fours with *Williams*.

Further, Green was aware of the bus incident long before he reported it even to Ms. Chaney or to others in the SS/HS program.  (Chaney Dep., p. 240-241).  However, he had done nothing. After Ms. Chaney learned of the bus incident, L.M. was initially interviewed by Ms. Chaney and Ms. Fields and, subsequently, by Ms. Chaney and Nurse JoAnn Nobles.  Both Ms. Chaney and Ms. Nobles have testified that L.M. stated that she was raped, by which she meant that she was forcibly sodomized on the school bus.    (Nurse JoAnn Nobles Dep., pp. 5-11; Chaney Dep., pp. 221-223).  One of the students, D.B., who had forced her to give him oral sex had a prior history of sexual abuse of minors (the first incident involving a 12 year old girl), yet no action had been taken to ensure that he was subject to additional supervision or that any other action was taken to ensure the safety of female students.  (Latimore Dep., pp. 98-100, 103-105).

Subsequently, Mr. Green arrived.  Ms. Chaney and Nurse Noble told him what L.M. had said, including that she had been forced to engage in oral sex.  Mr. Green's response was to state that he was going to find out what happened. He said, "I can get it out of her.  Y'all might not like the way I do it, but I can get it out of her.  He then he called L.M. in and asked her what happened. Instead of asking her about the conduct of the males in question, he began asking her if she asked for help. She said she did. Green sat at Dr. Fields office, at her chair, and he turned around and faced the window and he said, help.  He asked her "Did y'all hear that? You could hear that, couldn't you?" She agreed that she could.  However, Green did not ask her about the noise on the bus, nor about the fact that other students were attempting to cover for the two boys who were sodomizing

her. Instead, Green again turned around and said "Help.  Could you hear that?"  She said, yeah. He repeated it and asked.  "Could you hear that?" Again, she agreed that she could. He repeated this several times and culminated by stating "So if you really said help, if you really asked for help, somebody could have heard you."  At that point, L.M. began crying.  (Chaney Dep., pp. 231-232).

Green then switched gears and began telling L.M. that the boys were kind of popular and -- the boys are pretty popular, one of them plays football, and he changed his demeanor, so as to behave in a nicer way with her. He said, "Isn't it kind of true that, you know, you might want that attention?·  I mean, you know, they're popular boys, you might want that attention."  He said something to the effect of, didn't you want to do it for one of them, maybe not the other? That's like, didn't you want to do it?·  And then it got to be, "Did you like them? Did you know them?" As Ms. Chaney testified, he had an introduction for it. "Did you know them? They're kind of popular. Isn't it true you might like the attention?"  In short, he was trying to get her to admit that she wanted it.  During that interrogation, she admitted that she had liked C. but she didn't like B. And that's -- that came out after he was asking her didn't you want to do it and didn't you like them? And then after he got her story, sent her out of the room, and then started calling in the kids who were present that day.  (Id).

Although Ms. Chaney was not asked during her deposition about what the students said, the students who were observing the event corroborated L.M.'s statement that she was forced. (Chaney Declaration).  They described her as being dragged back and forth between the two boys, one of them describing it like a tennis match.  Contrary to Mr. Green's testimony (Green Dep., pp. 130-131), Ms. Chaney continued to ask him if he was going to make an official report to the appropriate law enforcement agency (Chaney Dep., pp. 210-211, 239-241).  Although he stated

that he would "take care of it," the only thing he ever did was speak to Sheriff Watson, a member of the SS/HS Core Management Team, who himself conducted no investigation at all.

Further, after L.M. made her report, Defendants failed to follow the applicable Title IX regulations, at 34 C.F.R. § 108, and advise the L.M. of her right to file a complaint either internally within the School District or externally with the Office for Civil Rights.  This occurred for the simple reason that they did not have (or could not identify) their Title IX Coordinator and had no idea what Title IX required.  (Green Dep., p. 8-9.)  As with the Gwinnett County School District, which had been held by OCR to have violated Title IX by failing to have appropriate complaint procedures – see *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 65 n. , 112 S. Ct. 1028, 117 L. Ed. 2d 208 (1992) – so, as well, did the Defendants lack the appropriate procedural rights for beneficiaries of the federal funds in question.

Instead of providing L.M. with the rights to which she was entitled under Title IX, Green subjected L.M. to a hostile cross-examination intended to cause her to retract her allegation that she was forced to engage in oral sex.  Further, when Plaintiff repeatedly asked Defendant Green if he intended to make a report to DFACS as required by Georgia law, he brushed her off, repeatedly refusing to answer her question, stating merely that he would take care of it.  There were many conversations about the bus incident; and every time Plaintiff would bring up counseling for the girl and about if it had been reported.  (Chaney Dep., 210:15-23; 211:1-13).  Plaintiff was concerned that Green did not report it and was concerned the student was not going to get counseling, so each time they had a conversation about the bus incident, Plaintiff would bring up these two things.  (Id., 211:1-13).  Green never told her that he had made a report nor did he obtain sex specific counseling for L.M.  Therefore, Ms. Chaney had no information even suggesting that Green had taken action when, on September 22, 2010, she made her complaint to the Georgia

Professional Standards Commission, part of which was to complain about Green's discriminatory conduct towards these students.[1]

Defendants' also assert that Defendant Green took appropriate action by contacting Sheriff Watson.  However, what they gloss over is that Defendant Green contacted Sheriff Watson in his capacity as a member of the SS/HS Core Management Team.  Watson had just as much obligation, as a member of the Core Management Team, to ensure that a proper report was made to law enforcement and that a proper investigation occurred.  Watson, who had worked with Green while they were both at the Georgia Bureau of Investigation, was not informed Green that one of the males had been in the YDC for child molestation.  (Watson Dep., 4:23-25; 5:1-2; 25:1-5).  Green also did not mention anything about L.M. saying she was forced to engage in the sexual act.  (Id., 47:3-17).  Green did not make a written report.  (Id., 46:21-22).  There are no documents, of any sort, indicating that any report was ever even made to Watson, rendering their testimony entirely suspect.

Neither Watson nor the Taylor County Sheriff's office undertook an investigation of the matter, nor did Watson report it to anyone else in the Taylor County Sheriff's Department nor to the other law enforcement agencies which would have had jurisdiction to conduct an investigation (Watson Dep., p. 21) nor to any other child protective agency.  Even today – other than the testimony of Green and his good friend, former co-worker, and current member of the Core Management Team Jeff Watson -- there is not a scrap of paper indicating that any such report was

---

[1]  A blatant example of Defendants efforts to change the chronology of events occurs with respect to this issue. Defendants assert that Ms. Chaney's PSC complaint was not in good faith because, once she was transferred to work with Mr. Latimore, she would have had access to the student's records.  However, the chronology is this:  She made her complaint on September 22, 2010; Green was purportedly suspended on September 27, 2010 (Smith Dep., Ex. 3; Green Dep., p. 67); yet, Green transferred Plaintiff to work under Latimore's supervision on September 28, 2010.  Thus, on September 22, 2010, when she made her PSC complaint, she did NOT have access to the student's records.  Further, she was also aware that the SS/HS program was barred from providing any counseling on any matters relating to sex, by Taylor County Board of Education Policy.  (Chaney Dep., p. 207).

made to anyone.  One must take Mr. Green's testimony with a grain of salt, in light of his prior conduct in committing, being indicted for, and pleading guilty to over 60 felony counts of falsification of official GBI records and obstruction of justice.  (Watson Dep., pp. 19-36).

Finally, Defendants assert that Ms. Chaney did not have an objectively reasonable belief that no action had been taken.  First, with regard to counseling the student, Ms. Chaney was aware that Mr. Latimore could not provide counseling services relating to sexual matters and, thus, could not counsel her on this incident.  (Chaney Dep., 207-208).  Second, with regard to taking any action to report the incident or otherwise take remedial action, Ms. Chaney continually followed up with Mr. Green, only to be repeatedly brushed off with "I'll take care of it."  However, even as of October, she learned from the investigator for the Office of the Inspector General of the United States Department of Education that there was no evidence that any report was made.  (Chaney Depo., pp. 244).

Clearly, given the above facts, Ms. Chaney had more than sufficient objective facts to believe that a violation of Title IX had occurred.  She repeatedly complained about Defendants failing to provide L.M. the rights to which she was entitled.  She wrote a letter, which is attached to the Declaration of Dory Bernard where she states, in part:

> I am bewildered as to why I am the target of such frivolous accusations. I have never and will never engage in hypocrisy and making accusations without merit. In regards to acting in the best interest of those we serve, I did make statements regarding needed changes in the supervision of the children after it was learned that a minor under the age of consent did engage sexual act with at least two others on the bus in the presence of a bus supervisor.

(Bernard Dec., Ex. 1, Doc. 41-6, pp. 3-4).

When she received no satisfaction from those internal complaints, she filed a complaint with the Georgia Professional Practices Division of the Georgia Professional Standards

Commission, in which she raised the same discriminatory conduct discussed above.  These complaints were clearly protected under both Title IX and Title VI.

### 2.      She was subjected to adverse actions

The first adverse action following her complaint to the Georgia PSC was that she was moved from her then-current position to a position working with Mr. Latimore.  This occurred the day after Defendants learned of her complaint, on September 28, 2010.  Although Defnedants have claimed that Mr. Green had already been suspended the day before, it was Mr. Green who carried out that involuntary transfer.  It was taken a single day after they learned of Ms. Chaney's Complaint.

The next adverse action was taken by Mr. Latimore and Mr. Smith when, the very same day he was appointed as her supervisor, he suspended her employment, giving her no reason whatsoever.  (Latimore Dep., Ex. 2).  The minutes of the meeting at which he was appointed supervisor have never been produced.  However, there is a dispute of fact as to whether Mr. Green was continuing to work – that is, after September 28 -- during his supposed suspension.  Ms. Chaney has testified that he was repeatedly present and met with Mr. Latimore behind closed doors on at least one occasion.

Finally, Ms. Chaney was terminated on November 9, 2010.  During this time, between her own illness and the Fall break, she had worked a total of eight days under Mr. Latimore's supervision.  No explanation was given for her termination.

Defendants claim that Mr. Latimore did not know that Ms. Chaney had filed the PSC complaint.  However, Mr. Latimore repeatedly lied about when he found out about the PSC complaint. He first claimed that Mr. Green did not tell him about the complaint.  (Latimore Dep., p. 64).  He claimed that Mr. Smith did not tell him about the complaint.  He claimed that he first

learned about Ms. Chaney filing a PSC complaint only when he read it in Complaint in this case, which he described repeatedly as "the federal lawsuit." (Latimore Dep., p. 61). He specifically denied discussing it with Mr. Green. (Latimore Dep., p. 64).

Within moments, he was forced to eat those words. This lawsuit was filed on September 28, 2011, one year after Ms. Chaney's transfer. (Doc. 1). However, records from the SS/HS program show that the members of the Board were discussing the fact that Ms. Chaney had filed the PSC Complaint and had been terminated no later than January of 2011. (Latimore Dep., pp. 68). As he then admitted:

> Q    You knew about the Professional Standards Commission complaint because you had found out from Mr. Green or Mr. Smith over here, correct?
>
> A    Uh-huh, yes.
>
> Q.   **They're the ones who told you about it?**
>
> A    **Yes.**
>
> Q    **It wasn't because you read it in the lawsuit, it's because they told you?**
>
> A    **Yes. Okay.**

(Latimore Dep., p. 68).

Latimore also lied about how often he had spoken to Green during Green's suspension, claiming that there was only one conversation throughout the period of Green's suspension, from September 27 to his reinstatement in March of 2011. (Latimore Dep., p. 113). His telephone records tell a different story. In fact, just between the period of Mr. Green's suspension and Ms. Chaney's termination, Latimore called Green no fewer than four times, including the day he terminated Ms. Chaney. (Latimore Dep., p. 115). Further, he admitted that there were no write-ups or other records showing disciplinary action against Ms. Chaney in her file, yet he denied having any conversation with Green about Ms. Chaney before making the decision to fire her.

- 9 -

(Latimore Dep., p. 118).  Given Latimore's other prevarications, it is beyond belief that he would not have discussed Ms. Chaney with Green prior to terminating her, just as it is beyond belief that he was unaware of the PSC Complaint.

The reason for Latimore's bland denials is clear.  Mr. Latimore admits that he had been warned that it would be harmful to the Defendants position in this lawsuit if he were to acknowledge that he knew about the PSC Complaint prior to terminating Ms. Chaney.  However, the facts demonstrate (a) his recollection of when he learned cannot be trusted (b) it is likely he would have been told and (c) he was aware of the benefit to him from denying knowledge of the PSC Complaint.  As he testified:

> Q      And previously you had adamantly denied that you knew she filed a PSC complaint until after you read it in the lawsuit?
>
> MS. PEARSON:·  Object to the form.
>
> BY MR. BILLIPS:
>
> Q      Correct?
>
> A      As I said, I found -- well, there's evidence showing that I knew about it in January 2011. I may have mistakenly said that I knew about it when I got the -- got a copy of the lawsuit.
>
> Q      Uh-huh.
>
> A      Time frames, yeah.·  I mean, a lot of time frames go through your head.
>
> Q      Right.·  And do you have a precise recollection of the circumstances under which you learned that Ms. Chaney had filed the PSC complaint?
>
> A      No.      All I knew is that the complaint was filed.
>
> Q      And do you have a precise recollection of the date on which you learned that Ms. Chaney had filed the PSC complaint?
>
> A      I can only go by the evidence that you presented in me reporting it to the Core Management Team.

Q        And that doesn't tell us when you learned it, it just tells us by when you had learned it, correct?

A        Well, you know, given that the Core Management Team meets every -- well, once a month and that's the first indication that was shown, that PSC was mentioned.· So I presumed that it was in January.[2]

Q        Well, but didn't you tell me that Mr. Smith had explained to the Core Management Team verbally why Mr. Green wasn't present?

A        I don't know if I said that or not.

Q        Do you want to read it back?  Do you recall that at the meeting on November 9th of 2010, you said Mr. Smith had explained verbally to the Core Management Team why Mr. Green was not present and you were in an acting supervisor capacity?

A        I don't know -- he had mentioned that I was serving as acting project director.· And I don't know exact -- specifically what he may have said to them or not.

Q        Well, you were in the room when he said it, right?

A        But I can't remember it.

Q        And it is possible that you knew as of that date that Ms. Chaney had filed the PSC complaint, isn't it?

A        No.

MS. PEARSON:· Object to the form.

BY MR. BILLIPS:

Q        Why isn't it possible?

A        Because I have no recollection of it.

Q        Sure.· You had no recollection of having known it in January either, right?

A        True.

---

[2] The Core Management Team met on October 25, 2010, the day before Ms. Chaney was suspended, and again on November 9, 2010, the day she was terminated.  No minutes of the October 25, 2010 Core Management Team meeting have been produced.

Q      So we have demonstrated that your recollection can sometimes be substantially flawed with regard to when you learned about this PSC complaint.· So it is possible that you knew about the PSC complaint and Ms. Chaney's role in it as of November of 2010 --

A      No.

Q      -- correct?

A      No.

Q      No.· And is the reason for that because you know that would be bad for you in this lawsuit?

A      That's your opinion.

Q      Well?

A      No.

Q      You are aware that that would be a bad fact for you in connection with this lawsuit, for you to know about the complaint before you fired her?

A      I guess, yeah, in your opinion, yes.

Q      Yeah.

A      But the fact still remains that I didn't know about it until January.

Q      How do you know?

A      Because I say so.

Q      Because you say so.· But you said two different things so far, nine months apart.· And I'm asking you about something that happened two months apart.

A      Well, the thing about it is, I did not know anything about a complaint or anything until we got -- we received the PSC complaint.

Q      Right.

A      You're right.· And that -- and I've indicated that that was in January.

Q      Well, whenever it was you received the PSC complaint, is that when you knew about it?

- 12 -

A       I knew about the PSC complaint then.

Q       When you received it?

A       Yeah.· When I was informed that we had a PSC complaint.

Q       And were you informed that the PSC complaint had been received shortly after it was received?

A       Well, sometime in January, as far as I can remember.

Q       Well, let's talk about whether you – when in connection to the school system receiving the complaint, okay?· Can you give me any idea whether it was a matter of days or a matter of weeks?

A       No, I don't.

Q       Because you don't remember?

A       I don't know.

Q       You don't know?

A       Right.

Q       That would be an important thing for you to know, that the grant program is under investigation by the Professional Standards Commission when you took over as interim project director, would you agree?

MS. PEARSON:· Object to the form.

BY MR. BILLIPS:

Q       You can answer.

A       Yes.

Q       And you would expect Mr. Smith to notify you of that if he knew, right?

A       I probably think so, yeah.

Q       In fact, the school system was made aware of the PSC complaint by Ms. Chaney on September 27th of 2010?

A       Uh-huh.

- 13 -

(Latimore Dep., pp. 87-92).

To demonstrate causation, "a  plaintiff must show that the decision-makers were aware of the protected conduct, and that the protected activity and the adverse actions were not wholly unrelated." *Shannon v. BellSouth Telecomm., Inc.*, 292 F.3d 712, 716 (11th Cir. 2002). Causation may be inferred by a close temporal proximity between the protected activity and the adverse action. *Thomas v. Cooper Light., Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007). "But mere temporal proximity, without more, must be 'very close.'" Id.

In this case, the temporal proximity was extremely close.  In fact, the day after Ms. Chaney made her complaint to the PSC, she was transferred by the purportedly suspended Mr. Green.  Mr. Green became aware that Ms. Chaney filed the Complaint, although Smith denies telling him. (Smith Dep., p. 38).  Since Smith was the custodian of the Complaint, The same day that Cicero Latimore became Interim Director, on October 26, 2010, he suspended Ms. Chaney without pay. (Latimore Dep., Ex. 2).  Thus, he took this action as soon as he possibly could. On November 9, 2010, at the first meeting after Latimore was appointed as Interim Director, he caused Ms. Chaney to be terminated.  (Latimore Dep., Ex. 3).

### B.    Claims For Complaining About Racial Discrimination

Ms. Chaney testified that her first notice of Ms. Bernard's discriminatory conduct towards African-American students came from Mr. Green himself.  (Chaney Dep., p. 170).  However, Mr. Green was not in a position – or at least was too afraid to put himself in the position – to take action against Ms. Bernard.  Ms. Bernard was the wife of the youth pastor at Mr. Smith's church. (Smith Dep., p. 51).   However, Ms. Chaney's testimony on this issue does not stand uncorroborated.

Sandra Lockett, the Counselor at Taylor County Middle School, testified that she informed her Principal and Assistant Principal that there was a racial disparity in the rate at which Dory Bernard was wait listing African American students compared to white students. (Lockett Dep., pp. 5-7). On at least one occasion, Ms. Chaney was present. (Id). In short, Ms. Chaney had evidence that black students were being deprived of services because of their race in a federally funded program.

Ms. Chaney's complaint about this racial discrimination was protected under Title VI, for the same reason that complaints about gender discrimination are protected under Title IX. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 125 S.Ct. 1497, 1502, 161 L. Ed. 2d 361 (2005). Defendants Green and Latimore were both aware of Ms. Chaney's complaints in this regard, as they participated in a meetgin in August of 2010, at which these issues were raised by Ms. Chaney. As she stated in the letter immediately after that meeting, which is Exhibit 1 to Ms. Bernard's Declaration:

> I also made statements regarding an incident in which Mrs. Bernard informed me of a black male elementary school student with whom she was having problems and was also considering dismissing from counseling services because he had accused her of being racist. I felt then as I do now that her response to ignore his concern was inappropriate and that dismissing him from the program would have been unjust. I have also conveyed concern over the method of choosing who and what constitutes immediate inception into counseling services versus being placed on the waiting list.

(Bernard Dec., Ex. 1 Doc. 41-6 p. 4).

Subsequently, in her PSC Complaint, Ms. Chaney reiterated these same concerns, as well as the issues relating to Mr. Green's felony convictions and lack of certification. (Smith Dep., Ex. 1). These complaints constituted protected activity under Title VI, as they specifically related to the denial of services in a federally funded program or activity.

Defendants suggest that Ms. Chaney would not have standing to complain about discrimination towards African-American students, claiming that they could not find any authority for the proposition that an employee would have protection under 42 U.S.C. Section 1981 for protecting the rights of African American students.  Defendants have not looked very far.

In holding that Section 1981 prohibits retaliation, the Supreme Court did not limit itself to employment cases.  Instead, the Court summarized the basis for its holding that Section 1981 prohibits retaliation thus:

> The upshot is this: (1) In 1969, Sullivan, as interpreted by *Jackson*, recognized that § 1982 encompasses a retaliation action; (2) this Court has long interpreted §§ 1981 and 1982 alike; (3) in 1989, Patterson, without mention of retaliation, narrowed § 1981 by excluding from its scope conduct, namely post-contract-formation conduct, where retaliation would most likely be found; but in 1991, Congress enacted legislation that superseded Patterson and explicitly defined the scope of § 1981 to include post-contract-formation conduct; and (4) since 1991, the lower courts have uniformly interpreted § 1981 as encompassing retaliation actions.

*CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 451, 128 S. Ct. 1951 (2008).  The Court relied on *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 125 S.Ct. 1497, 1502, 161 L. Ed. 2d 361 (2005), a Title IX case in which a teacher complained about discrimination against students and was subjected to unlawful retaliation.  The Court also relied on *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 90 S. Ct. 400 (1969), a Section 1982 case in which a white home owner challenged a restrictive covenant which excluded black ownership of property.  Thus, the notion that Ms. Chaney would not be protected under Section 1981 for protecting students from racism in an educational program to which they had been accepted is unsupported by any modern cases.

Further, Defendants' contention that Ms. Chaney did not bring this matter to Latimore's attention is belied by the evidence presented by Defendants.  In the meeting on August 10, 2010, at which Mr. Latimore and Mr. Green were in attendance – referenced in the Declaration of Dory Bernard – Ms. Chaney specifically objected to this precise issue.  She followed up with a letter,

- 16 -

which is attached to Ms. Bernard's Declaration and was sent to Mr. Latimore, among others. In the meeting and in this letter, she objected to the fact that Ms. Bernard was not serving African American students and had threatened to expel a student for expressing his belief that Ms. Bernard was being racist towards him.  Ms. Chaney's complaints regarding these matters are clearly protected under Section 1981.

For the same reasons set forth above, Ms. Chaney has shown a causal connection.  There was a short period of time between her complaints and Defendants' adverse actions.  Defendant Latimore's bland denials that he was unaware of her PSC complaint run head on into his lies about when he first learned about the complaint.  He admits that he cannot – or perhaps chooses not – to remember when he first learned of the PSC complaint, but insists – just because he says so – that he did not learn about it until January.  Yet, he also admits that the only reason he admitted that he knew of it as early as January was that there was documentary proof that he could not deny.  As he stated:

> Q      And the only reason you're admitting that you knew in January is because I put a document in front of you that you can't deny?
>
> A      Did that document say that she filed a complaint with the PSC?
>
> Q      Right.
>
> A      Okay.
>
> Q      Yes.
>
> A      Yes.
>
> Q      And that's the only reason that you are now admitting you knew as early as January?
>
> A      Yes.
>
> Q      Otherwise, you'd still be claiming that it was because -- that it was when you read the federal lawsuit, wouldn't you?

A      If that's what my recollection gives me, yes.

(Latimore Dep., pp. 71-72).  In short, Latimore would say whatever he believed he could

get away with saying, irrespective of the truth.

To demonstrate causation, "a plaintiff must show that the decision-makers were aware of

the protected conduct, and that the protected activity and the adverse actions were not wholly

unrelated." *Shannon v. BellSouth Telecomm., Inc.*, 292 F.3d 712, 716 (11th Cir. 2002). Causation

may be inferred by a close temporal proximity between the protected activity and the adverse

action. *Thomas v. Cooper Light., Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007). "But mere temporal

proximity, without more, must be 'very close.'" Id.

In this case, the temporal proximity was extremely close.  In fact, the day after Ms. Chaney made

her complaint to the PSC, she was transferred by the purportedly suspended Mr. Green.  Mr.

Green became aware that Ms. Chaney filed the Complaint, although Smith denies telling him.

(Smith Dep., p. 38).  Since Smith was the custodian of the Complaint, The same day that Cicero

Latimore became Interim Director, on October 26, 2010, he suspended Ms. Chaney without pay.

(Latimore Dep., Ex. 2).  Thus, he took this action as soon as he possibly could. On November 9,

2010, at the first meeting after Latimore was appointed as Interim Director, he caused Ms.

Chaney to be terminated.  (Latimore Dep., Ex. 3).

C.     Georgia Whistleblower Act

Defendants' contention about the Georgia Whistleblower Act is that no Georgia funds were

being expended in the program in which the discrimination occurred and, thus, there were no

Georgia funds which were implicated in the violation of "laws, rules, or regulations."  This is

simply wrong.

- 18 -

As Sheriff Watson – a member of the Core Management Team – testified, the employees who performed services under the SS/HS Grant were employees of the Taylor County School District.  (Watson Dep., p. 7-8).  Superintendent Smith tried mightily to ignore the copious documentation demonstrating that this is true, but had to admit that ever single document demonstrated that they were employees of the Taylor County School District.  (Smith Dep., pp. 6-13).  As such, the "program or activity" which was receiving federal financial assistance was the Taylor County School District.  20 U.S.C. Section 1687, adopted in response to the limiting restriction imposed by Grove City College v. Bell, 465 U.S. 555 (1984).  The Taylor County School District expends both local, state and federal money, such that it is clearly an agency covered by the Act.  It is further clear that – in the words of Fulton Cnty. v. Colon, 316 Ga.App. 883, 889 (2012) – Ms. Chaney's complaints related to a state-funded program or operation under the jurisdiction of the County.  (Watson Dep., pp. 7-8; Smith Dep., pp. 6-13).

Defendants also contend that Ms. Chaney's complaints were made in reckless disregard for their truth.  In fact, her complaints about Dory Bernard were supported by the testimony of Sandra Lockett and precipitated by statements of Defendant Green, who was the first to advise Ms. Chaney of Ms. Bernard's racist conduct.  Her complaints about the failure to properly respond to the rape of L.M., discussed above, are fully supported by the facts, including the fact that there was never any law enforcement investigation – or even a written law enforcement report – regarding the forcible sodomy perpetrated on this 14 year old girl.  Not only Ms. Chaney, but also Nurse Nobles, testified that L.M. said she was forced.  Under those circumstances, it is ridiculous to assert that her complaints were not made in good faith.  Finally, with regard to her complaint that Mr. Green did not have the requisite certification, Defendant Smith himself has admitted to

that fact.   (Smith Dep., pp. 23-24).   Thus, on this claim as well, Defendants Motion must be defeated.

IV        CONCLUSION

Defendants have thrown a hodge podge of unrelated facts at the Court, attempting to confuse the Court into believing that there is no basis for Plaintiff's claims to go to trial.  The simple facts are these and they are undisputed.  Plaintiff was told by others within her employer about the racial discrimination perpetrated by Dory Bernard and witnessed it herself. She complained verbally and, on August 10, 1010, in writing.  Nothing was done.

Plaintiff also personally witnessed a distraught 14 year old girl who had been forcibly sodomized on a  school bus.  One of the perpetrators had a history of such conduct.  She sought to have some action taken to discipline these budding rapists and to provide counseling specific to this incident to the victim, but nothing was done.  Finally, fed up with the inaction, she filed complaints with the Georgia Professional Standards Commission and the Office of the Inspector General of the United States Department of Education.   As a result, she was immediately transferred, summarily suspended, and ultimately fired.  The facts entitle her, at the very least, to a jury trial at which she can present the evidence which entitles her to judgment in her favor.

This 3rd day of June, 2013.


/s/ Meredith J. Carter
Matthew C. Billips
Georgia Bar No. 057110
Meredith J. Carter
Georgia Bar No. 325422

- 20 -

Billips & Benjamin, LLP
3101 Towercreek Parkway, Suite 190
Atlanta, GA  30339
(770) 859-0751 (telephone)
(770) 859-0755 (fax)
Billips@bandblawyers.com
Carter@bandblawyers.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION**

| | | |
|---|---|---|
| ERICA CHANEY, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO.: |
| | ) | 4:11-cv-142-CDL |
| v. | ) | |
| | ) | |
| TAYLOR COUNTY SCHOOL DISTRICT, | ) | JURY TRIAL DEMANDED |
| WAYNE SMITH, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**CERTIFICATE OF SERVICE**

I certify that I electronically filed the foregoing **"PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT"** with the Clerk of Court using the CM/ECF system which will automatically send email or other notification of such filing to the following attorneys of record:

Phillips L. Hartley, Esq.
Martha M. Pearson, Esq.
Harben, Hartley & Hawkins, LLP
Suite 750, Wells Fargo Center
340 Jesse Jewell Parkway
Gainesville, Georgia  30501

This 3rd day of June, 2013.

/s/ Meredith J. Carter
Meredith J. Carter
Georgia Bar No. 325422

- 22 -