## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## COLUMBUS DIVISION

| | | |
|---|---|---|
| ERICA CHANEY, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO.: |
| | ) | 4:11-cv-142-CDL |
| v. | ) | |
| | ) | |
| TAYLOR COUNTY SCHOOL DISTRICT, | ) | JURY TRIAL DEMANDED |
| WAYNE SMITH, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION UNDER PENALTY OF PERJURY
## OF ERICA CHANEY

Pursuant to 28 U.S.C. §1746, Erica Chaney hereby submits her declaration in support of

Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment.

1.

My name is Erica Chaney.  I am of legal age and under no legal disability. My testimony

is based on my own personal knowledge and is given for use in connection with the above-styled

action.

2.

Valerie Harris and Dory Bernard worked at the Taylor County DFACS, not Rhonda Tabor.

3.

Green's Administrative Assistant, Michelle Slaton, was not African American.

4.

When working for Taylor County as a FSA, I did not receive any referrals and I never saw

a referral a parent completed.  Dory Bernard would pick up the referrals and give them to me when

she finished with them.  Bernard did all of the referrals.  She would review them and decide at that

time whether to provide services.  Bernard would then tell me when she has scheduled the parents to come in for the initial assessment so that we could complete paperwork at the same time.  There was no reason for me to refer or deny referrals for counseling.  If Bernard scheduled an appointment for a child that automatically meant the child was going to receive counseling, and completing the initial assessment would be a formality.  If the child was wait-listed or Bernard did not want to provide services, then no assessment was performed and she would have me to send a letter to the parent informing them that no counseling would be provided.  Valerie Harris never trained me on SS/HS referral protocol.

5.

I did complete initial assessment of what the student in the SS/HS needed.  However, Valerie Harris and I served different age groups and I did not perform the same services as Harris. Rod Green told me that I was not qualified to provide counseling or therapy and I was not automatically qualified to determine what type of mental health services were needed for a student.

6.

During my employment, I had never heard of Joyce Kennon until Defendants brought her name up during this lawsuit.

7.

If I suspected any students of suffering from abuse, then Green told me I was to run it by him, not to an outside agency.  During my interview for the FSA position, Principal Debbie Naggy asked me what I would do if I made a report of sexual abuse to my supervisor and nothing happened, and I responded that I would report it outside the system and Naggy agreed.

8.

I did log contact with students on forms in the quarterly reports.  I have very few contacts because Bernard would not allow me to see the kids when she counseled them and I was told not to pull them out of class.

9.

When I was hired, Harris and Cicero Latimore only discussed job duties with me for approximately two hours.  Harris introduced herself and gave me an overview of the job and a general explanation of how to complete quarterly reports.

10.

Carol Norris did not ask me anything referenced in Defendants' Statement of Material Facts No. 42 and did not discuss forms with me at any time during my employment.

11.

Bernard labeled the African American little boy, S.S., "belligerent."  Bernard was the one who told me that he accused her of favoring a white female during a group therapy session.  The boy was not six years old; he was in the third grade.  When Bernard invited me to sit in a session with him and I agreed with the little boy that she was favoring the white female, I was never invited to any future sessions with any of the students.

12.

I told Bernard that from what I witnessed during the session with S.S. and the little white girl, Bernard was definitely more comfortable and open to the white female than the black male in the session.  I told her there was a disparity in treatment and suggested she be mindful of her interaction with the white female when in the presence of the black male, or she should conduct

separate counseling sessions.  Latimore did not become involved with this situation until after I informed Green of the situation and he involved Latimore.

13.

The only students Bernard asked my opinion on were black.  I have asked Bernard why she counseled white children with issues either less severe or experiencing less risks than blacks who were being wait listed.

14.

Mostly black students were waiting on Bernard's services.

15.

I never asked Green to move my office.  I learned through a handwritten note from Belinda Oates.  After I received the note, I asked Green about it and he explained that I was being moved so that I could assist with behavior problems after Coleman's retirement.  Green told me that if he had the opportunity like me to have his own office, I should take it.

16.

Once I moved to the elementary school, Bernard thought I was no longer coming to work because she was not informed of the move and neither was Latimore or Harris.  Green arranged a staff meeting to discuss our relationship and after the meeting, Green told us to find a way to work the mess out because he was tired of it and that the whole mess did not start until after he denied Harris' request to swap office locations with me. During this meeting, Harris and Bernard criticized me and I asked them to support their criticisms, but was not confrontational.

17.

I wanted Bernard to put everything in writing because she would say one thing and do another and documentation protected both of us in our jobs.

18.

Green told me he would not pay for me to attend the FAST training program because it was too expensive and he wasn't going to pay if he knew I wanted to leave. I did not become extremely angry as alleged in DSMF #76. I simply asked Green why he paid for another employee to attend training who had already accepted another job and had announced her plans to quit SS/HS. It was then Green who became extremely angry.

19.

Green did not know about my recorded conversation with Bernard until after it was discovered, so Green did not use this as an excuse to have me and Harris change positions.

20.

After Green had been suspended on September 28, 2010, I ran into Green several times in Latimore's office in October 2010. Green also answered an email from me requesting training and he approved the training request while suspended.

21.

During the CRCT testing, Coleman explained the processes used at Taylor County to proctor a standardized test. Coleman then asked me if Houston County used the same processes, and I responded "no", and went on and explained the differences. I did not suggest that Coleman do things as Houston County had done, I was merely responding to a question asked. Coleman mistakenly considered my response as "insubordination."

22.

All of my absences while employed with Taylor County were excused and there are documents that will show Green excused my absences. In regards to Defendants' claim that my whereabouts were unknown, there were several times I had to wait in the teacher's lounge at the

primary school because Bernard would not give me a key to the office. When my office was at the elementary school, I had two cellular phones and was easily accessible. After I was moved to the high school, I shared an office with two others on a full time basis and a police officer on a part time basis. I was also down the hall from Latimore's office and he could easily stop by to find me. On my first day at the high school, no other SS/HS staff member was in the office and I could not locate Harris to get a key, so I had to sit in my car and wait.

23.

During my tenure at Taylor County, I submitted three quarterly reports. I was at fault for turning in one quarterly report late. Another of my reports was turned in on time. The final report was late due to high school grade deadlines and fall break. Latimore was aware ahead of time that this report was going to be late and approved it being late. I submitted her final quarterly report on October 21, 2010, which was my last active day at work.

24.

I did not have a problem with Valerie Harris and got along with her.

25.

Another child Bernard had wait-listed, she was forced to see due to teacher complaints, but even then, she did not counsel the child.

26.

Sandra Lockett told me that the eldest sibling of the two black children who were being sexually abused started acting out on peers at school and I told Bernard this.

27.

Bernard told me that she had received a referral for the two students referenced in DSMF #102. She told me it came from DFCS and was classified as "Diversion". I had no prior knowledge

- 6 -

of any of the students in Taylor County and would not know their addresses or have the need to make a home visit and discuss community resources with Green for this family. Green was aware that Bernard was not servicing these kids and I kept him abreast of new issues with the siblings as they occurred via email and in fact to face meetings.

28.

When Bernard would be in N.'s presence that she recommended should be seen by a pediatrician, she would stammer and stutter because the child would refuse to do what Bernard wanted her to do; and Bernard would just tell the child to lay on the floor. Bernard did not counsel N. Bernard never even attempted counseling until she suggested medication and a physician's attention to the parent.

29.

The bus incident occurred on Thursday, June 24, 2010. In July 2010, Green came to Fort Valley State and told Dr. Fields about the bus incident. After Green left the campus, Dr. Fields called me over to her in the parking lot and asked why I had not told her about the incident. I told Dr. Fields I did not know about it until she told me. Dr. Fields then said she wanted the two of us to talk to the female student together and that I should plan to do so within the next hour. Dr. Fields contacted Nurse Nobles so that she could interview the student.

30.

Next, Dr. Fields came to meet me and we talked to the female student together. After we talked to the student, Dr. Fields instructed me to take the female student from the bus incident to Nurse Nobles. Dr. Fields, myself and the student went to see Nurse Nobles at the infirmary. The only time Dr. Fields asked the student about the incident was before Nurse Nobles was called and before Green was called.

31.

After Dr. Fields, Nurse Nobles and I interviewed the student, I called Green and told him that Nurse Nobles had contacted Amy Thomas and Green called and cancelled the appointment. It was then that Green conducted his interrogation and the student missed the bus.

32.

When Green allowed the student to tell her story uninterrupted in Fields' office, the student mentioned the words "forced" and "raped." Fields and Green were present when these words were used. In addition, when Dr. Fields and I interviewed the student, the student said she was forced and put her hand on her head to show how she was "forced" down to perform oral sex.

33.

One of the kids Green interviewed told them that at the pool, the female student had let one of the boys fondle her in the pool, but not necessarily that she would perform the sex act later on that boy.

34.

For those students Green did interview, I heard the students say that the two boys on the bus were pulling the female student back and forth by her wrist, and that it was not on her own free will.

35.

Green did not interview the two boys on the same day that he interrogated the female student. Green did not expect talking with the boys' parents would go very far because one of the boy's father was a volunteer basketball coach, but seemed to care very little for his child and the other boy's mother and grandmother were not active in his life.

36.

I told the mother of the female student that there were two boys involved and she told me that Green had only told her about one boy, not two.

37.

Green took the female student home in his car because she missed the bus, not because he wanted to inform the mother about the bus incident.

38.

Green did not respond to Ms. Burk in a timely fashion in regards to getting her daughter counseling, so she went to Morning Star counseling in Reynolds, GA.  When she went to Morning Star, Ms. Burk was told that she needed a referral and she called Green, but he never called her back. Ms. Burk told me that her daughter was not seeing Latimore for counseling related to the bus incident.

39.

The female student told Plaintiff that Latimore knew she was still in the classroom with one of the boys from the bus incident.

40.

Green told me after I asked about reporting the incident that he still had to figure out where it happened because the bus went through three counties and he had to report it to the right one.

41.

The two boys from the bus were not removed from the program. One of the boys had quit long before the field trip and the other boy, Plaintiff instructed another counselor, Justin Bryant, to tell him he could not participate in the field trip two days before the trip.

42.

Latimore told Plaintiff that D.B. had been charged with child molestation.

43.

I was told that Sheriff Watson previously worked with Green and that the Sheriff would not be receptive to my complaints.

44.

Before I was suspended by Latimore on October 26, 2010, I had only worked with him for eight days, which included October 4 through October 8 and October 18 through October 21.  Fall break was October 22 through October 15 and I was out on October 20.  During the eight days I worked with him, Latimore had not yet been named my supervisor, and I never worked with Latimore when he was my supervisor.

45.

I contacted OIG in September and met with Special Agent Christopher Maisano in October and began giving him documents.  Maisano could not announce his investigation until Joel Hill made his investigation known.

46.

I applied with Taylor County before March 2010, but did begin employment with Taylor County on March 8, 2010. I was a candidate for a Master's Degree in Criminal Justice at Boston University.

This ___3rd___ day of June, 2013.

Erica Chaney