**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION**

ERICA CHANEY,                          )
                                       )
        Plaintiff,                     )        CIVIL ACTION NO.:
                                       )        4:11-cv-142-CDL
v.                                     )
                                       )
TAYLOR COUNTY SCHOOL DISTRICT, )        JURY TRIAL DEMANDED
WAYNE SMITH, *et al.*,                 )
                                       )
        Defendants.                    )

---

**PLAINTIFF'S RESPONSE TO DEFENDANTS'
STATEMENT OF MATERIAL FACTS**

I.      The Safe Schools/Healthy Students Initiative

1.

In 2008, the Executive Director of the Taylor County Family Matters Collaborative began the process of applying for grant funds available through the Safe School/Healthy Students ("SS/HS") Initiative, a federal program supported through the United States Departments of Education, Justice, and Health and Human Services.  Affidavit of Nancy Peacock, ¶4.

**RESPONSE**:

        **Admitted, but not material.**

2.

Taylor County Family Matters Collaborative is part of and receives funding from the Georgia Family Connection Partnership which is, in turn, funded by both state and private funds. Peacock Aff. ¶ 2.

**RESPONSE**:

        **Admitted, but not material.**

- 1 -

3.

The SS/HS Initiative was intended to create safe and drug-free schools and promote healthy childhood development by addressing violence, including bullying, alcohol, tobacco and drug abuse, and by providing social and emotional learning, parent education and social support for families using an integrated, comprehensive community-wide plan.  Peacock Aff. ¶4; Exh. 1.

**RESPONSE**:

**Admit.**

4.

The initiative was to provide services including, research-based prevention curriculum, peer mediation programs, family case management services, school based mental health therapy services, substance abuse early intervention programs, behavioral intervention services, intensive family therapy and support group services, school based mentoring programs, support groups, and student wellness teams.  Id.

**RESPONSE**:

**Admit.**

5.

The SS/HS grant was awarded for four years (and was extended for a fifth year) with the Taylor County Board of Education serving as the "fiscal agent" of the grant monies, but the program was governed by a Memorandum of Agreement signed by representatives of the School District, the local juvenile justice agency, the local law enforcement agency, and the local public mental health authority, which were required grant "partners."  Peacock Aff. ¶5; Exh. 1.

**RESPONSE**:

**Admit.**

6.

The grant partners designated a "senior representative" to sit on the "Core Management Team" ("CMT") which was charged with implementation of and oversight of the program.  Id.

**RESPONSE**:

    **Admit.**

7.

The senior representatives on the CMT were the School District's superintendent, Defendant Wayne Smith, Jeff Watson, Taylor County Sheriff, Wayne Jernigan, juvenile court judge, and Annie Leggitt, of Middle Flint Behavioral Health Care.  Peacock Aff. ¶5.

**RESPONSE**:

    **Admit.**

8.

The CMT made the decisions regarding the employment of individuals to staff the SS/HS initiative.  Id.

**RESPONSE**:

    **Admit.**

9.

After selecting a Project Director who managed the day-to-day operation of the grant, the CMT took recommendations from the Project Director for employment of individuals in the remaining positions funded by the grant.  Peacock Aff. ¶6.

**RESPONSE**:

    **Admit.**

10.

None of the SS/HS grant employees were recommended by the superintendent or approved by the Taylor County Board of Education, although the superintendent participated in personnel decisions as one of the members of the CMT.  Deposition of Wayne Smith, pp. 6-9.

**RESPONSE**:

**Deny.  The Taylor County Board of Education issues grant employees I-9 forms in the name of Taylor County Board of Education ("the Board") and issues W2s in the name of the Board.  (Smith Dep., 7:6-10).  Employees of the SS/HS Grant ("the Grant") signed a document stating they understood they were employees of the Board conditioned on the money continuing to be present.  (Id., 7:21-25)**

**In addition, Sheriff Watson testified that the SS/HS personnel policies "fall basically under the school system's personnel."  (Watson Dep., 7:22-25; 8:1).  Watson testified that the people in the SS/HS are employed as part of the school system and therefore fall under the policies and procedure and operations of the school system.  (Id., 8:4-8).**

**Furthermore, after Plaintiff was terminated from employment with Defendant, the Board reported that it was her employer and it was signed by Defendant Smith.  (Smith Dep., 9:13-25; 10:1).**

11.

No local county education or State of Georgia funds were used to pay any part of the grant employees' salary or benefits or any other expenses of the grant program.  Affidavit of Jennifer Albritton ¶3.

**RESPONSE**:

**Deny.  Please see Plaintiff's response to DSMF #10.  There is no evidence where the**

**funds came from.  There is no evidence that a separate bank account existed so that the funds were separate from Taylor County.**

### 12.

The grant called for a Project Director, two Mental Health Therapists ("MHT"), two Family Service Assistants ("FSA") who functioned as social workers, two employees to deliver the research-based curricula in the classroom, and one employee to provide parent education services. Peacock Aff. ¶6.

<u>**RESPONSE**</u>:

**Admit**.

### 13.

The grant did not require any of the SS/HS staff to hold Georgia teaching certification. Smith Depo., p. 24; Peacock Aff. ¶6.

<u>**RESPONSE**</u>:

**Admit the Grant did not require any of the staff to hold a Georgia teaching certificate, but without a valid certificate, Green had to be removed from campus and could not be around children of the Taylor County Schools.  (Smith Dep., 25:2-19).  Further, Defendant Green was suspended with pay because he had a revoked certificate.  (<u>Id.</u>, 25:14-24).**

II.    <u>Staffing the Grant Program</u>

### 14.

The CMT selected Defendant Green, an African American male, as the Project Director in August 2008.  Peacock Aff. ¶6.

<u>**RESPONSE**</u>:

**Admit.**

15.

At the time he was selected for the Project Director position, Green had been serving as a site coordinator since 2005 at Taylor County High School for another grant administered by the Family Matters Collaborative entitled 21st Century Community Learning Centers.  Peacock Aff. ¶3.

**RESPONSE**:

**Admit.  During the time Green was serving as site coordinator for the 21st Century Grant, his teaching certificate had been revoked on May 17, 2006 and was allowed around students.  (Smith Dep. 23:19-24).**

16.

The 21st Century Community Learning Centers grant, also federally funded but awarded through the Georgia Department of Education, provided funds for establishing learning centers operating outside of regular school hours for academic enrichment and tutoring to students in high poverty and low-performing schools and for literacy and educational development programs to those students' families.  Peacock Aff. ¶3.

**RESPONSE**:

**Admit.**

17.

Green graduated from Taylor County High School in 1985, was honorably discharged from the United States Army in 1989 after achieving the rank of Corporal, and received a B.S. in Criminal Justice and a Masters degree in Public Administration from Columbus State University. Affidavit of Rufus Green, ¶3.

**RESPONSE**:

**Admitted, but not material. Plaintiff objects that this fact is an attempt by Defendants to bolster Green's credibility and is not a material fact that is in dispute. A witness' credibility can only be weighed by a jury, not in a motion for summary judgment.**

18.

The CMT hired Defendant Latimore, an African American male, to the position of Mental Health Therapist. Green Aff. ¶6.

**RESPONSE**:

**Plaintiff objects to this Fact on the basis that it is not supported by the referenced citation, unless Defendants are now contending that Rufus Green is the Core Management Team ("CMT"). Paragraph 6 states that Green simply recommended to the CMT that Defendant Latimore be hired. Paragraph 6 does not state that Defendant Latimore was hired by the CMT. Subject to this objection, Plaintiff admits that Defendant Latimore is an African American male that was in the position of Mental Health Therapist during Plaintiff's employment.**

19.

Latimore had served as a member of the Taylor County Board of Education, and for over twenty-five years as a counselor and mental health therapist in both the public and private sectors in various roles serving children, adolescents and their families. Deposition of Cicero Latimore, pp. 76-82.

**RESPONSE**:

**Admit**.

20.

Latimore has a Bachelors degree in Economics and Business Administration and a Masters

Degree in Vocational Rehabilitation Counseling both from Fort Valley State University.  Latimore Depo. p. 6.

**RESPONSE**:

      **Admitted, but not material.  Defendant Latimore's education is not a material fact that is in dispute.**

<div align="center">21.</div>

Latimore is licensed by the Composite Board of Medical Examiners as a Licensed Professional Counselor ("LPC").  Latimore Depo. pp. 5-6.

**RESPONSE**:

      **Admit.**

<div align="center">22.</div>

The CMT hired Dory Bernard, a Caucasian female, to the other Mental Health Therapist position.  Deposition of Dory Bernard, p. 4.

**RESPONSE**:

      **Deny.  Plaintiff objects that DSMF #22 is not supported by the cited evidence.  There is no indication in Bernard's deposition that she was hired by the CMT.  In fact, Bernard admitted in her deposition that she is an employee of the school system.  (Bernard Dep., 5:3-5).  Subject to same, Dory Bernard is a Caucasian female that serves as a mental health therapist with the Taylor County School District since December 2008.  (Id., 4:18-24).**

<div align="center">23.</div>

Prior to employment in the SS/HS initiative, Bernard had been working as a social service specialist for Taylor County Department of Family and Children Services ("DFACS") since coming to Taylor County in 2005.  Bernard Depo., pp. 5, 40.

**RESPONSE**:

**Deny.  Plaintiff objects that this fact is not supported by the citation.  Bernard states that she began working for DFACS in October 2005 and came to Taylor County in December 2008.  (Bernard Dep., 4:18-24; 5:12-15).**

24.

Bernard earned an undergraduate degree in Psychology from Black Hills State University in South Dakota and two Masters degrees from Southwestern Baptist Theological Seminary in Fort Worth, Texas, one in Marriage and Family Counseling and the other in Christian Education. Bernard Depo., pp. 6-8.

**RESPONSE**:

**Admitted, but not material.  Bernard's education is not a material fact that is in dispute.**

25.

Because Bernard was not yet licensed but had completed all but the examination for licensure, she worked under the supervision of Latimore.  Bernard Depo., pp. 12-13; Latimore Depo. p. 76; Affidavit of Cicero Latimore, ¶4.

**RESPONSE**:

**Admitted, but not material.**

26.

Latimore was assigned to counsel students in high school and middle school, and Bernard was assigned to students at the elementary and primary school, although students at all age levels were counseled by each therapist depending on the particular needs of the student.  Latimore Aff. ¶4; Green Aff. ¶6.

**RESPONSE**:

    **Admit.**

<div align="center">27.</div>

Two FSAs were selected: Valerie Harris, a Caucasian female, who was assigned to the middle and high schools, and Rhonda Tabor, an African American female, who was assigned to the elementary and primary schools.  Affidavit of Valerie Harris ¶3; Green Aff. ¶6.

**RESPONSE**:

    **Admit.**

<div align="center">28.</div>

Both Harris and Tabor had previously worked at Taylor County DFACS.  Harris Aff. ¶2; Green Aff. ¶7.

**RESPONSE**:

    **Deny.  Harris and Dory Bernard worked there, not Tabor.  (Declaration of Erica Chaney, "Chaney Dec.", at ¶ 2).  In addition, Plaintiff objects that this Fact is not a material fact that is in dispute.**

<div align="center">29.</div>

The CMT, upon the recommendation of Green, hired three individuals, all of whom were African American, to deliver the prevention curricula and provide parent education services and an administrative assistant was hired to work in a clerical capacity for the Project Director.  Green Aff. ¶6; Peacock Aff. ¶7.

**RESPONSE**:

    **Deny.  The Administrative Assistant, Michelle Slaton, was not African American. (Chaney Dec. at ¶ 3). In addition, Plaintiff objects that this Fact is not a material fact that is**

<div align="center">- 10 -</div>

**in dispute.**

<div align="center">30.</div>

Norris Consulting Group, Inc. served in the capacity of evaluator for the grant.  Affidavit of Carol Norris, ¶3.

**RESPONSE**:

> **Admit.**

III.    <u>Roles of the MHT and FSA and Grant Evaluation Documents and Records</u>

<div align="center">31.</div>

School District personnel or the students' parents referred students to the SS/HS program by completing a form given to the FSA that asked for a description of the reason for the referral. Bernard Depo., p. 64; Harris Aff. ¶4, Exh. 4.

**RESPONSE**:

> **Deny.  Plaintiff did not receive referrals and never saw a referral a parent completed. (Chaney Dec. at ¶ 4).  Furthermore, Harris never gave Plaintiff any referral protocol.  (<u>Id</u>.). The entire time Plaintiff worked with Dory Bernard, Bernard would pick up the referrals and give them to Plaintiff when she finished with them.  (<u>Id</u>.).**

<div align="center">32.</div>

Based on a review of the referral form, the FSA, in the role of social worker, made the initial assessment of what services the student needed and whether they could be provided by the program or whether a referral to services in the community was required.  Harris Aff. ¶4.

**RESPONSE**:

> **Deny.  Plaintiff did not make the initial assessment of what the student needed. (Chaney Dec. at ¶ 5).  Valerie Harris and Plaintiff served different age groups and Plaintiff**

<div align="center">- 11 -</div>

did not perform the same services as Harris.  (<u>Id</u>.).  **Green told Plaintiff that she was not qualified to provide counseling or therapy.  (<u>Id</u>.).  Therefore, Plaintiff was not automatically qualified to determine what type of mental health services were needed for a student just because she had the job title of "FSA."  (<u>Id</u>.).  Furthermore, Harris never gave Plaintiff any training on referral protocol.  (<u>Id</u>. at ¶ 4).**

33.

The grant program services that the FSA could determine were appropriate for a student included after-school tutoring, mentoring, early intervention parent training for students with children from birth to four years old, the Families and School Together ("F.A.S.T.") program, or the Youth Energized to Succeed ("Y.E.S.") program for substance abuse prevention.  Harris Aff. ¶4.

**RESPONSE**:

 **Deny.  Please see Plaintiff's responses to DSMF #31 & 32.**

34.

The FSA could also determine that a student or the student's family could benefit from other social services in the community, such as Adult Education and technical training, ElderCare, and Department of Labor employment services, and could assist the family in obtaining these services.  Harris Aff. ¶4.

**RESPONSE**:

 **Deny.  Please see Plaintiff's responses to DSMF #31, 32 & 33.**

35.

Based on the referral form, the FSA could also refer the student to the Mental Health Therapist for counseling.  Latimore Aff.¶3; Bernard Depo., pp. 16, 64; Harris Aff. ¶4.

**RESPONSE**:

Deny.  Bernard did all of the referrals.  (Chaney Dec. at ¶ 4).  Bernard had a waiting list of kids who were not being served.  (Bernard Dep., 66:18-24; 67:10-24).  Defendant Green told Bernard she needed to go ahead and see the kids on waiting lists, or refer the kids on the lists to other services to be seen.  (**Id**., 69:12-20).

36.

If the FSA determined there was reason to believe the student was physically or sexually abused or neglected, the procedures in place required the FSA to notify the School District's social worker, Joyce Kennon, who was responsible for making a report to the Taylor County DFACS. Bernard Depo., p. 49; Harris Aff. ¶5.

**RESPONSE**:

Deny.  This fact is not supported by the citations listed.

The citation to Bernard's deposition did not mention anything about the FSA's procedures.  Bernard testified that there is a liaison that they, meaning all workers at the school, are supposed to report abuse to and not just FSAs.  (Bernard Dep., 49:2-10).  In addition, Bernard indicated that they could report abuse to a liaison **or** to Joyce Kennon, since Kennon makes all referrals for the school system to DFCS.  (**Id**.).

The citation to Paragraph 5 of Harris' Affidavit did not mention anything about the FSA's procedures.  Harris said that she would discuss her concern with Defendant Latimore if she believed a student was being physically or sexually abused and then **they** would notify Joyce Kennon.  (Harris Affidavit at ¶ 5).  Harris did not say that the FSA procedure was to be the only individual that was to report abuse concerns to Kennon.  (**Id**.).

Furthermore, during Plaintiff's employment, she had never even heard of Joyce

**Kennon until Defendants brought her name up in this lawsuit.  (Chaney Dec. at ¶ 6).  Green instructed Plaintiff to run any students suspected of suffering from abuse by him, not to an outside agency.  (Id. at ¶ 7).  During Plaintiff's interview for the position, Principal Debbie Naggy asked Plaintiff what she would do if she made a report of sexual abuse to her supervisor and nothing happened; Plaintiff responded she would report it outside the system and Naggy agreed.  (Id.).**

<div align="center">37.</div>

Once a student was referred to the program, the FSA was responsible for monitoring and logging the activities the student participated in, as well the contacts the FSA had with the student, his teachers, and his parents.  Norris Aff. ¶5; Harris Aff. ¶6.

**RESPONSE**:

**Deny.  Harris states that she monitored and logged activities of <u>middle</u> and <u>high</u> school students.  (Harris Aff. at ¶ 6).  Plaintiff worked with <u>elementary</u> school students until she was transferred to the middle and high schools a few weeks before her termination on September 28, 2013, which was announced at the staff meeting.  (See, DSMF #80) (Chaney Dep., 273:9-16).  Plaintiff was not required to perform the same services as Harris because of the different age groups they serviced.  (Chaney Dec. at ¶ 5).  The procedures were different for each school because Plaintiff was never informed that she was responsible for the above-referenced procedure.  (Id. at ¶ 8).  Plaintiff did log contact with students on forms in the quarterly reports.  (Id.).  Plaintiff had very few contacts because Bernard would not allow me to see the kids when she counseled them and I was told not to pull them out of class.**

**Moreover, when Plaintiff began working for SS/HS, Harris and Defendant Latimore only discussed her job duties with her for approximately two hours.  (Id. at ¶ 9).  When**

<div align="center">- 14 -</div>

**Plaintiff began her employment, Harris showed her how to complete one form and did not provide training.  (Chaney Dep., 123:21-25; 124:1-10).  Further, Plaintiff was allowed to review her job description prior to her interview, but was never given a copy of her job description, despite repeated attempts to obtain one.  (Chaney Dep., 121:19-25; 122:1-17).**

38.

A major component of the grant was the identification of students who were in need of mental health counseling.  Norris Aff. ¶6.

**RESPONSE**:

**Admit.  However, Plaintiff did not serve as a mental health counselor.**

39.

Because the FSA was the initial point of contact for students referred to the program, it was essential for the FSA to communicate effectively with the MHT and to inform the therapist of the potential need for counseling.  Green Aff. ¶7; Latimore Aff. ¶3; Bernard Depo., p. 64-64; Harris Aff. ¶¶4, 6.

**RESPONSE**:

**Admit.  However, Plaintiff would refer Bernard students that she believed needed counseling and Bernard would not provide some services at all to the black students.  (Chaney Dep., 192:20-25; 193:1).  Bernard would place black students on waiting lists.  (Id., 170:18-25; p. 171).  Bernard had a waiting list of kids who were not being served.  (Bernard Dep., 66:18-24; 67:10-24).   Defendant Green told Bernard she needed to go ahead and see the kids on waiting lists, or refer the kids on the lists to other services to be seen.  (Id., 69:12-20).**

40.

After receipt of a referral from the FSA, the MHT conducted a psychosocial assessment of the student, and if deemed appropriate for the counseling offered by the grant, the MHT developed a treatment plan and began providing the services either through individual or group counseling. Latimore Aff. ¶3.

**RESPONSE**:

**Deny.  Perhaps Latimore participated in this practice, but Bernard placed several of her students on waiting lists and had to be instructed by Green to either see the students or refer them elsewhere.  (Bernard Dep., 66:18-24; 67:10-24; 69:12-20).**

41.

Norris Consulting produced forms for employees to use to document their activities.  Norris Aff. ¶¶5-6.

**RESPONSE**:

**Deny.  Plaintiff has no recollection of any forms presented to her from Norris Consulting except quarterly reports.  (Chaney Dec. at ¶¶ 8 & 10) (Chaney Dep., 124:6-10).**

42.

Norris Consulting asked each FSA to enter information on a form entitled "Individual Service Record" ("ISR") of every contact the FSA had with a student or the student's parent or any contact with other agencies or teachers about the student.  Norris Aff. ¶5, Exh. 2; Harris Aff. ¶6, Exhs. 3 and 4.

**RESPONSE**:

**Deny.  Carol Norris did not ask Plaintiff anything and did not discuss the forms with Plaintiff at any time during her employment.  (Chaney Dec. at ¶ 10).**

43.

Each student enrolled in the program was supposed to have an ISR and those forms were turned into Norris Consulting on a quarterly basis.  Norris Aff. ¶5; Harris Aff. ¶7.

**RESPONSE**:

      **Admit.  Please see Plaintiff's responses to DSMF #41 & 42.**

      **Plaintiff did complete initial assessment of what the student in the SS/HS needed. (Chaney Dec. at ¶ 5).  Plaintiff did log contact with students on forms in the quarterly reports. (Id. at ¶ 8).  Plaintiff had very few contacts because Bernard would not allow Plaintiff to see the kids when she counseled them and Plaintiff was told not to pull them out of class. (Id.).**

44.

The FSAs were also asked to complete quarterly forms that documented their individual activities and accomplishments during the quarter, including participation in staff development and training programs.  Norris Aff. ¶5; Exh. 3; Harris Aff. ¶7, Exh. 5.

**RESPONSE**:

      **Deny.  Please see Plaintiff's responses to DSMF #41 & 42.**

45.

Mental Health Therapists did not complete ISRs.  Bernard Depo., p. 56; Norris Aff. ¶6.

**RESPONSE**:

      **Admit.**

46.

Mental Health Therapists entered information into a database created by Norris which allowed the evaluator to track the counseling contacts and the progress of the student based on the student's grades, attendance, and discipline referrals.  Bernard Depo., pp. 57-60; Norris Aff. ¶6.

**RESPONSE**:

    **Admit.**

<div align="center">47.</div>

Each Mental Health Therapist kept a file on every student that contained the psychosocial assessment and notes from each counseling session.  Latimore Aff. ¶3.

**RESPONSE**:

    **Deny.  Bernard testified that there were no physical documents.  (Benard Dep., 59:25; 60:1).**

<div align="center">48.</div>

The Mental Health Therapists' files, unlike the ISRs, were not submitted to the evaluator because of the confidential counseling and assessment information they contained.  Norris Aff. ¶6.

**RESPONSE**:

    **Admit.  Bernard testified that there were no physical documents.  (Benard Dep., 59:25; 60:1).**

    IV.    <u>Plaintiff's Employment</u>

<div align="center">49.</div>

In early 2010, the FSA who was working with primary and elementary school students resigned.  Green Aff. ¶7.

**RESPONSE**:

    **Admitted, but not material.**

<div align="center">50.</div>

Plaintiff, an African American female, applied for the position in March 2010 and submitted a resume that showed a Bachelor's Degree in Criminal Justice from Fort Valley State

University and that she was a "candidate" for a Masters Degree in Criminal Justice at Boston University.  Deposition of Erica Chaney, p. 117; Green Aff. ¶7, Exh. 3.

**RESPONSE**:

**Deny.   Plaintiff applied before March 2010, but did begin employment with Defendant Taylor County on March 8, 2010. (Chaney Dec. at ¶ 46).**

**Plaintiff also denies the presentation of the word "candidate".   Plaintiff was a candidate for her Master's Degree in Criminal Justice at Boston University.   (<u>Id</u>.).**

51.

Plaintiff's records from Boston University show that she was dismissed from the program in the fall of 2007 and had obtained only 8 hours of credit from the 28 she attempted.  Certified records from Boston University, Bates ## DEFENDANTS 1365 – DEFENDANTS 1417.

**RESPONSE**:

**Deny.  Plaintiff objects that the citation is to documents that are hearsay and are not authenticated.   Further, Plaintiff objects that this is an improper attack on Plaintiff's credibility which is for a jury to decide, and not a decision for the Court to decide for a summary judgment motion.  Lastly, Plaintiff objects that this Fact is not relevant and not a fact that is material and in dispute and is an improper attempt to assert an after-acquired evidence defense in a summary judgment motion.   Defendants have never indicated throughout this lawsuit that Plaintiff terminated because she did not have a degree in Criminal Justice.**

52.

Plaintiff had no education or training in mental health counseling and, therefore, was not expected nor authorized to provide those services to students.  Green Aff. ¶7; Latimore Depo. p. 24.

**RESPONSE**:

**Admit.  This is precisely the reason that Plaintiff, as a FSA, did not evaluate students to determine whether they needed counseling or what type of counseling they needed. (Chaney Dec. at ¶ 5).  Green informed Plaintiff that she was not qualified to provide counseling or therapy and thus, she was not qualified to determine the type of mental health services a student may or may not need, in contravention to the information contained in Harris' Affidavit. (Id.).  (Harris Aff. at ¶¶ 4 & 5).**

53.

Plaintiff represented on an application for employment prior to the position with Defendants that she was a degree candidate in Clinical Psychology at Capella University but the records from that institution show that she enrolled in 6 courses from fall of 2008 to fall of 2009, attempting 30 hours of credit and withdrawing from every course, earning no credit at all.  Certified Records from Capella University, Bates ## DEFENDANTS 1418 – DEFENDANTS 1463.

**RESPONSE**:

**Plaintiff objects that the citation is to documents that are hearsay and are not authenticated.  Further, Plaintiff objects that this is an improper attack on Plaintiff's credibility which is for a jury to decide, and not a decision for the Court to decide for a summary judgment motion.  Lastly, Plaintiff objects that this Fact is not relevant and not a fact that is material and in dispute and is an improper attempt to assert an after-acquired evidence defense in a summary judgment motion.  Defendants have never indicated**

throughout this lawsuit that Plaintiff terminated because she did not have a degree in Clinical Psychology.

<div align="center">54.</div>

Plaintiff had five sporadic years of social work experience, working in five different settings, including three different DFACS offices.  Chaney Depo. pp. 28-36, 43-44, 53-55, 56-59,62,75-82, Exhs. 1,3,5,7,8,10-14.

**RESPONSE**:

Plaintiff admits she had five years of social work experience, but denies that it was "sporadic."  Defendants are attempting to use Plaintiff's work history to attack Plaintiff's credibility which is improper at summary judgment.

Subject to same, Plaintiff testified that she was a social worker at three different locations from the Fall 2004 through May 19, 2008:  1) Peach County DFACS; 2) Crawford County Department of Family and Children services; and 3) Bibb County DFACS.  (Chaney Dep., pp. 26-57).  During this time, Plaintiff took medical leave several times, but was continually and steadily employed with Bibb County from September 16, 2005 through May 19, 2008.  (Id., 34:24-25; 35:1-5; 57:3-6).  Plaintiff next volunteered as an assistant for a company called TWI in Toombs County, Georgia.  (Id., 76:1-17).  Then in May 2009, Plaintiff took a full time job with the Georgia Center for Youth.  (Id., 59:3-6; 68:16).  However, Plaintiff never obtained employment as a social worker after she resigned from Bibb County in May 2008.  (Id., 57:11-13).

Plaintiff testified that she took medical leave several times during this time period, but she still maintained employment with Bibb County DFACS from 2005 through May 2008.  (Chaney Dep., pp. 28-56)

In addition, Plaintiff objects to this Fact as not relevant and not a material fact that is in dispute since Plaintiff's background in social work is not at issue in this matter.  Plaintiff further objects that this is an improper attempt at Defendants to establish an after acquired evidence defense, even though Plaintiff's background in social work was on her resume at the time she was hired by Defendant Green.

<div align="center">55.</div>

Plaintiff was assigned to replace the FSA at the primary and elementary schools working with Dory Bernard, the "white girl that was at the primary school."  Chaney Depo. p. 123; Bernard Depo., pp. 15-16; Green Aff. ¶7.

**RESPONSE**:

Admitted, except that the quote is not from Plaintiff.  In Plaintiff's deposition, she testified that Green's brother called her to tell her about the job opening and did not know Dory Bernard's name, and instead referred to her as "the white girl that was at the primary school."  (Chaney Dep., 123:7-20).

<div align="center">56.</div>

As early as April, one month after she began employment, Plaintiff began accusing Bernard of racial insensitivity and of discriminating against African American students.  Chaney Depo., pp. 170-172.

**RESPONSE**:

Deny.   Green, not Plaintiff, was the one who initially brought up complaints about Bernard and how she acts with black people.  (Chaney Dep., 170:9-18).  Prior to Green bringing up Bernard's problems with black people, Sandra Lockett informed Plaintiff that Bernard discriminated against black people and was not servicing African American kids.

<div align="center">- 22 -</div>

(<u>Id</u>., 186:10-19).  Additionally, on Plaintiff's first day at Taylor County, Bernard apologized to Plaintiff in advance for not knowing how to act around black people because she had only been around about five in her life because she was from Wyoming.  (<u>Id</u>., 157:20-23).  Bernard asked Plaintiff to overlook things she might do or say.  (<u>Id</u>., 157:23-25).

After Green brought up Bernard's treatment of black people, Plaintiff told Green about the S.S. situation and about things that she had heard at the primary school such as when Bernard took the white police officer's grandkids into counseling before she took the two black kids who were possibly being sexually abused and how she was wait-listing black kids.  (<u>Id</u>., 170:18-25; p. 171).   In regards to the white police chief's grandchildren, Bernard took them right away into counseling after they witnessed their father beating their mother, but did not give counseling to the African American kids who were being subjected to sexual abuse every night in their home, even though the reason she gave for not counseling these kids was because she did not have any space available.  (<u>Id</u>., 174:9-19).  (<u>Id</u>., 176:8-14).

Despite Plaintiff's complaints, Green did nothing about her complaints during the time Plaintiff was employed with Defendant.  (Chaney Dep., 193:20-25; 194:1-9; 195:1-6).

Further, Plaintiff responds that even if she did complain about Bernard not servicing students in April, one month after employment began, she had every right to complain about a violation of a federally protected right that protects individuals from discrimination based on race at any time during her employment.  One does not have to maintain employment for a certain amount of time before speaking up about a violation of a federally protected right.

57.

Bernard believed that Plaintiff questioned her judgment and proposed strategies for counseling students as though she were supervising Bernard's work.   Affidavit of Dory Marler

- 23 -

Bernard, ¶2

**RESPONSE**:

Admit Plaintiff questioned Bernard's judgment, but deny Plaintiff proposed strategies for counseling students. Plaintiff absolutely questioned Bernard's judgment especially since Bernard had told Plaintiff that she did not know how to deal with black kids. (Chaney Dep., 172:20-25). In addition, Bernard had problems with both white and black kids who were not submissive and had problems with the white and black kids who questioned her. (<u>Id.</u>, 172:9-15). Bernard would not treat the black kids. (<u>Id.</u>, 172:15-16). In fact, one of Bernard's black children called her a racist because Bernard would hug and give treats to the white children if they got something right, but would not hug or give treats to the black children. (<u>Id.</u>, 173:15-25; 174:1-8). Bernard labeled that boy, S.S., as "belligerent." (Chaney Dec. at ¶ 11).

Additionally, Bernard would give preference to the kids in her church since her husband was a youth pastor at her church. (Chaney Dep., 175:1-5). However, one mother in Bernard's church asked that she not counsel her son anymore because it had gotten out what she was seeing him for and the problems at home, and she believed Bernard was spreading this information to others. (<u>Id.</u>, 175:5-14). Bernard even shared what was going on in this boy's home with Plaintiff and how she didn't like the mother. (<u>Id.</u>, 175:15-24).

Plaintiff did not propose strategies for counseling students, but disagreed about Bernard not following policy regarding the children that she would admit for counseling in the program and the criteria they were supposed to meet. (<u>Id.</u>, 176:24-25; 177:1-8). Plaintiff did not agree with her not taking a child because the child needs medication. (<u>Id.</u>, 177:12-20).

58.

Plaintiff believed that Bernard was racially insensitive.  Chaney Depo., pp.179-180.

**RESPONSE**:

**Admit.  Please see Plaintiff's response to DSMF #56 &57.**

**Another example of Bernard being racially insensitive occurred in preparation for a FAST meeting (Families and Students Together), where Bernard made some comments about the kids and other comments that were racially insensitive.  (Chaney Dep., 179:8-16). Bernard made a comment about chitlins and how she didn't know what they were and attempted to describe what they were, but Green told her she was wrong in her description. (Id., 179:18-25; 180:1).  When Green explained what they were, Bernard commented to the effect "why would you eat that?"  (Id., 180:2-3).  Green proceeded to explain to Bernard that back in the day, black people did not have a choice of meats and had to eat what they were given.  (Id., 180:2-6).   Bernard's response to chitlins offended Green and the little boy who had said his family would bring chitlins to the FAST program.  (Id., 180:7-15).**

**Also, Plaintiff told Bernard that from what she had witnessed, Bernard was definitely more comfortable and open to a white female than another black male that was in a session. (Chaney Dec. at ¶¶ 11 & 12).  Plaintiff told her that there was a disparity in treatment and suggested she be mindful of her interaction with the white female when in the presence of the black male, or conduct separate counseling sessions.  (Id.).  The only students Bernard asked Plaintiff's opinion on were black.  (Id. at ¶ 13).**

**On another occasion, Plaintiff asked Bernard why she counseled white children with issues either less severe or experiencing less risk than blacks who were being wait listed. (Id.).**

59.

Green had been working with Bernard for over a year, had observed no discrimination against African American students and had not received similar complaints from the previous African American FSA whom Plaintiff replaced.  Green Aff. ¶8; Deposition of Rufus Green, pp. 197-199.

**RESPONSE**:

**Deny.  Please see Plaintiff's response to DSMF #56.  Green told Plaintiff he had gotten many complaints about Bernard and the way she acts with black people, and he wanted to know if that was going on.  (Chaney Dep., 170:9-18).**

60.

Green had not had any complaints about Bernard from parents of students in the program, from Latimore or any of administrators with whom Bernard worked. Green Depo., p. 199; Green Aff. ¶8.

**RESPONSE**:

**Deny.  Please see Plaintiff's response to DSMF #56-59.  Green, not Plaintiff, was the one who initially brought up complaints about Bernard and how she acts with black people. (Chaney Dep., 170:9-18).  Prior to Green bringing up Bernard's problems with black people, Sandra Lockett informed Plaintiff that Bernard discriminated against black people and was not servicing African American kids.  (Chaney Dep., 186:10-19).**

**Plaintiff believed Green was complicit in Bernard's discrimination against African American students based on race.  (Chaney Dep., 182:12-17).  In addition, at least two complaints were written from parents and grandparents of students about Bernard. (Chaney Dep., 175:8-15) (The letters are attached hereto as Exhibit 1).  Additionally, Sandra**

**Lockett testified that there were more black students on the waiting lists than whites and believed that was a factor in regards to whether a student was being served.  (Lockett Dep., 24:24-25; 25:1-6).  Mostly black students were waiting for Bernard's services.  (Chaney Dec. at ¶ 14).**

<div align="center">61.</div>

Plaintiff's complaints to Green about Bernard seemed to him to be based on her belief that she was more competent than Bernard and more deserving of Bernard's job.  Green Aff. ¶8.

<u>**RESPONSE**</u>:

**Deny.  Please see Plaintiff's response to DSMF #56-60.**

**In addition, Plaintiff objects that this fact is not supported by the cited evidence. Green did not testify that Plaintiff believed she was more competent than Bernard and more deserving of Bernard's job.  (Green Aff. at ¶ 8).  In fact, Plaintiff admits that she was not qualified to counsel students and make determinations regarding their mental health, and that Green told her same.  (Chaney Dec. at ¶ 5).**

<div align="center">62.</div>

Bernard's supervising therapist, Latimore, who regularly consulted with her and reviewed her documentation, found no evidence of discrimination against African American students. Latimore Aff. ¶4.

<u>**RESPONSE**</u>:

**Deny.  Plaintiff objects that this Fact is not supported by the cited evidence.  Latimore said he "never had any reason to believe that she was discriminating against African Americans students", not that he did not have any evidence.  (Latimore Aff. at ¶ 4). Furthermore, Plaintiff testified that either Green told Latimore about what she told Green**

<div align="center">- 27 -</div>

about the student S.S. or Latimore was present during the conversation or that Latimore was made aware because Latimore brought it to Plaintiff's attention.  (Chaney Dep., 182:1-5).  Plaintiff testified that Latimore asked Chaney about what happened and said something to the effect that he was going to check on it.  (<u>Id</u>., 182:6-11).

Further, Plaintiff believed Latimore was complicit in Bernard's discrimination against African American students based on race.  (<u>Id</u>., 182:12-17).

63.

Plaintiff did not complain to either Latimore or Smith about Bernard's alleged treatment of African American students.  Chaney Depo., pp. 188-190, 196.

<u>RESPONSE</u>:

Deny.  In Exhibit One to Bernard's Affidavit, Plaintiff discusses that Bernard had said in the meeting that she was considering dismissing a student from counseling because the student accused her of being racist.  (<u>See</u>, Exhibit one to Dory Bernard's Declaration, Doc. 41-64).

Plaintiff admits, however, she did not complain to Smith about the way Bernard was servicing the African American students.  (<u>Id</u>., 195:22-25; 196:1).

64.

After receiving permission from Green, in August, Plaintiff moved her office from the primary school to the elementary school so she no longer shared an office with Bernard.  Green Aff. ¶9.

<u>RESPONSE</u>:

Deny.  Plaintiff never asked Green to move her office.  (Chaney Dec. at ¶ 15).  Plaintiff learned by a handwritten note from Belinda Oates.  (<u>Id</u>.).  A copy of the note is attached

hereto as Exhibit 2.  After Plaintiff received the note, she asked Green about it and he explained she was being moved so that she could assist with behavior problems after Coleman's retirement.  (<u>Id</u>.).  Green also told Plaintiff that if he had the opportunity like her to have his own office, she should take it.  (<u>Id</u>.).  Once Plaintiff moved to the elementary school, Bernard thought Plaintiff was no longer coming to work because she was not informed of the move and neither was Latimore or Harris.  (<u>Id</u>. at ¶ 16).  Green arranged a staff meeting to discuss their relationship and after their meeting, he told them to find a way to work the mess out because he was tired of it and that the whole mess did not start until after he denied Harris' request to swap office locations with Chaney.  (<u>Id</u>.).

<div align="center">65.</div>

On August 11, 2010, Green arranged for Latimore and his FSA, Harris, to meet with Bernard and Plaintiff to offer suggestions, based on their own positive working relationship, as to how Plaintiff and Bernard should handle the process of communicating about students in the program, as well as the proper roles of the therapist and the FSA with regard to those students in counseling.  Chaney Depo., pp. 250-251; Green Aff. ¶9; Latimore Aff. ¶5; Harris Aff. ¶11; Bernard Depo., pp. 31-32.

<u>RESPONSE</u>:

> **Admit.**

<div align="center">66.</div>

Plaintiff was confrontational during the August 11, 2010 meeting with both Harris and Bernard.  Bernard Depo., pp.31-32; Harris Aff. ¶11; Latimore Aff. ¶5.

<u>RESPONSE</u>:

<div align="center">- 29 -</div>

**Deny.  During the meeting, they criticized Plaintiff and she asked them to support their criticisms, but was not confrontational.  (Chaney Dec. at ¶ 16).**

67.

Plaintiff responded to the August 11, 2010 meeting with a letter to the meeting participants objecting to what she characterized as "frivolous accusations." Chaney Depo. p. 250, Exh. 24.

**RESPONSE**:

**Admit.**

68.

Following receipt of Plaintiff's letter, Bernard and Plaintiff had another confrontation about the method of communicating about the students Bernard was counseling, specifically Plaintiff's demand that Bernard put everything about the student in writing.  Bernard Depo., p. 32; Chaney Depo., p. 251.

**RESPONSE**:

**Admit.  Bernard would say one thing and do another and having documentation of everything helped protect both of them in their jobs.  (Chaney Dec. at ¶ 17).**

69.

Because of the confrontation referenced in #68 above, Bernard sent an email to Green regarding Plaintiff's demand that all their communication be put in writing and, as a result, Green had a conference with both Plaintiff and Bernard on August 17th, during which he issued an oral reprimand to both of them regarding their inability to communicate and perform their job duties. Bernard Depo., pp. 32-33; Green Aff. ¶9.

**RESPONSE**:

**Admit.**

70.

Because of the conflict with Plaintiff, Bernard began keeping a log of their contacts, both in person and their email communication.  Bernard Aff. ¶3, Exh. 2.

**RESPONSE**:

**Deny.  Bernard kept a log of her contacts with Plaintiff because Plaintiff had complained about her having black students on the waiting lists more so than white students and had questioned Bernard about why she counseled white children with issues less severe than black children who were being wait listed.  (Chaney Dec. at ¶¶ 13, 14).  Please see Plaintiff's response to DSMF # 39, 56-60, 62 & 109.**

71.

Following the meeting on August 17th, Plaintiff sent an email to Green telling him, among other things, that she had upset Bernard in an attempt to make him aware of "her conduct," that is, Bernard's refusal to turn over to Plaintiff the students' treatment plans. Chaney Depo., pp. 252-253, Exh. 25.

**RESPONSE**:

**Deny.  Plaintiff told Green she had upset Bernard because Bernard told Plaintiff she had upset her.  (Chaney Dep., 252:15-18).  Plaintiff was not "complaining."  (Id., 253:10-16). Plaintiff sent the email because she wanted Green to know that Bernard refused to tell Plaintiff how the children were doing, how she was supposed to talk to the parents to facilitate communication about their progress or lack thereof.  (Id., 253:5-9, 12-25).**

72.

In August or September, Plaintiff began actively pursuing employment elsewhere, notifying Green in September of 2010 that an employer in Florida would be calling him for a

reference and that she needed time off to go to Florida regarding the job.  Green Depo., pp. 200-201; Chaney Depo., pp. 258-265.

**RESPONSE**:

    **Deny.  Someone from the Jewish Children's Home called Green before Plaintiff had a chance to tell him.  (Chaney Dep., 261:7-11).**

<div align="center">73.</div>

    On September 16, 2010, Green informed the CMT at its regular monthly meeting that there would likely be a vacancy in one of the FSA positions and they would need to start the process of recruiting and advertising for the position.  Green Aff. ¶10; Green Depo. pp. 202-203; Peacock Aff. ¶9.

**RESPONSE**:

    **Admit.**

<div align="center">74.</div>

    Prior to Plaintiff's trip to Florida, she told Bernard that she would be leaving for another job and her last day of employment would be September 24, 2010.  Bernard Aff. ¶4.

**RESPONSE**:

    **Deny.  In the recorded conversation Defendants reference in their Motion, Plaintiff clearly states that she did not tell Bernard she would be leaving, but that Friday would "most likely" be her last day.  (Doc. 41-6).  During this discussion, Bernard even apologized for getting the information wrong.  (Id.).**

<div align="center">75.</div>

    Upon her return from Florida, Plaintiff emailed Green that she needed to meet with him right away and, in that meeting, demanded that he make the F.A.S.T. training program available

<div align="center">- 32 -</div>

to her immediately at a cost of several thousand dollars.  Green Depo., pp. 202-203; Green Aff. ¶10; Chaney Depo. pp. 265-266.

**RESPONSE**:

     **Deny.  On September 20, 2010, Plaintiff sent Green an email telling him that she needed to start planning the FAST program because she and Valerie Harris had discussed FAST a couple of weeks ago and that Plaintiff may want to get trained on FAST prior to starting and that she would ask Green about it.  (See  emails re FAST attached hereto as Exhibit 3) (Chaney Dep., 265:22-25).  Green responded to Plaintiff's email and told her to come to his office.  (Id., 265:25; 266:1).  Green went on to explain that the training program was too expensive and he was not going to pay to train her when he knew she wanted to leave. (Chaney Dec. at ¶ 18).**

<p style="text-align:center">76.</p>

     When Green expressed reservations about spending the money to train her given her expressed interest in leaving the program, Plaintiff became extremely angry.  Green Depo., pp. 202 -203.

**RESPONSE**:

     **Deny.  Plaintiff simply asked Green why he paid for another employee to attend training who had already accepted another job and announced her plans to quit SS/HS. (Chaney Dec. at ¶ 18).  It was Green who then became extremely angry after Plaintiff said this.  (Id.).**

<p style="text-align:center">77.</p>

     On September 22, 2010, Plaintiff confronted Bernard accusing her of telling staff members that Plaintiff was taking another job and blaming Bernard for Green's reaction to Plaintiff's

decision to remain employed in the grant program. Bernard Aff. ¶4.

**RESPONSE**:

**Deny.  Plaintiff was not confrontational as demonstrated by her tone on the recording produced by Defendants in their Motion for Summary Judgment.  It is clear from the transcript that there is no hostility.  The conversation speak for itself and Plaintiff directs the Court's attention to the transcript filed by Defendants of this alleged confrontational conversation.  (Doc. 41-6).**

78.

Unknown to Bernard, Plaintiff recorded her September 22, 2010 meeting with Bernard. Bernard Aff. ¶4, Exh. 3.

**RESPONSE**:

**Admitted, but not material.  Pursuant to O.C.G.A. §§ 16-11-62, 16-11-66, Georgia is a one party consent law for purposes of making audio recordings and conversations.**

79.

Green concluded that the relationship between Bernard and Plaintiff was not going to improve, particularly given Plaintiff's anger about the fact that Bernard had told staff that Plaintiff was taking another job, and, therefore, he decided to have Plaintiff and Valerie Harris change positions so that Plaintiff would work with Latimore.  Green Depo., pp. 65, 208; Green Aff. ¶10; Harris Aff. ¶14.

**RESPONSE**:

**Deny.  Green did not know about Plaintiff's conversation with Bernard until after the conversation was discovered.  (Chaney Dec. at ¶ 19).  In addition, please see Plaintiff's response to DSMF #64.**

80.

Green announced the decision for Plaintiff and Harris to exchange positions at a staff meeting on September 28, 2010 after first discussing it with Harris and Plaintiff a day or two before the meeting.  Green Aff. ¶10, Exh. 5.

**RESPONSE**:

**Admit.  Harris had asked Green to switch our work locations and he said he was not going to do it because he did not want the blacks in one place and the whites in the other. (Chaney Dep., 273:13-25).  In addition, Plaintiff responds that this is an example of Green acting as a Project Director even after he had been suspended.  (See, email memorializing his suspension attached hereto as Exhibit 4 and an email from Harris dated September 30, 2013 referencing Green moving her to Primary, attached hereto as Exhibit 5).**

81.

On September 22, 2010, Plaintiff faxed a complaint to the PSC containing numerous accusations against Green of ethical misconduct.  Chaney Depo., Exh. 22.

**RESPONSE**:

**Admit.  Smith learned of the PSC complaint when he got a call from Gary Walker, Director of the PSC, before the faxed copy referenced in Exhibit 1 to his deposition.  (Smith Dep., 22:16-25; 23:1-5).**

82.

On September 27, 2010, the PSC faxed a copy of Plaintiff's complaint to the School District.  Smith Depo., p.22, Exh.1.

**RESPONSE**:

**Admit**.

83.

One of the accusations in the complaint was that Green was a "convicted felon" whose teaching certificate had been revoked.  Id.

**RESPONSE**:

**Admit.  Gary Walker, Director of the PSC, also told Smith that Green had a revoked certificate since 2005.  (Smith Dep., 23:15-24).  Green had never told Smith it had been revoked until he received the call from Walker.  (Id., 23:25; 24:1-3).**

84.

Although Smith was aware of the criminal charges and that Green had not been "convicted" of them, he did not know that Green had received a waiver to teach or that it had been revoked because of the criminal charges.   Smith Depo., pp.17, 22-23.

**RESPONSE**:

**Admit.  In addition, Green was not "convicted" because he pled guilty to all counts in the indictment.  (Green Dep., 22:9-14).  Smith also did not know that Green had a certificate, didn't know Green taught in Macon County, and did not know Green had gotten in trouble down there prior to the call from Walker.  (Smith Dep., 24:6-13).**

85.

After speaking with an employee at the PSC, Smith concluded that it was necessary to determine from the PSC whether there was any impediment to allowing Green to continue to work in the SS/HS program since the position did not require a teaching certification.  Smith Depo., pp. 24-25.

**RESPONSE**:

 **Admit. Smith discussed what he should do with Walker. (Smith Dep., 25:2-6). Smith suspended Green with pay on September 28, 2010. (Id., 25:22-24; 27;1-2, Exh. 2, p. 26). Smith does not believe the Core Management Team ever took a vote on whether or not to suspend Green. (Id., 27:19-23).**

<div align="center">86.</div>

 Shortly after receiving the PSC complaint, Smith met with Green and told him not to return to work until the issue regarding his certification could be resolved. Smith Depo., p. 92; Green Depo., pp. 51-52.

**RESPONSE**:

 **Admit. Smith called Green to meet with him on September 28, 2010. (See, Exhibit 4).**

<div align="center">87.</div>

 Green did not return to work until March 1, 2011 after his certificate was changed on the PSC website to reflect that it had expired rather than had been revoked and at that point, the CMT decided he could be reinstated as Project Director. Green Depo., p. 211; Smith Depo., pp. 29-31, 73; Peacock Aff. ¶10.

**RESPONSE**:

 **Deny. During Green's suspension, he was still performing duties pertaining to the grant, including holding a staff meeting on September 28, 2010 to move Plaintiff and Harris to different schools. (Chaney Dep., 273:9-16). Additionally, a complaint was made against Smith for him allowing Green to continue to work in his position after he was suspended, but**

Plaintiff did not make the complaint and did not know one had been made.  (Chaney Dep., p., 274).  A copy of Smith's email stating same is attached hereto as Exhibit 16.

Green and Latimore also made calls with each other on the Grant telephones after Green had been suspended.  (Latimore Dep., 116:1-24).  Plaintiff ran into Green in Latimore's office several times in October 2010 after Green had been suspended.  (Chaney Dec. at ¶ 20).  Green answered an email from Chaney and approved a training request while suspended as well.  (Id.).  (See, emails of Plaintiff asking for training and Green responding in October 2010 attached hereto as Exhibit 6).

In addition, Green was allowed to return to work even though the PSC issued an order on February 10, 2011 denying Green's right to reapply for a Georgia Educator Certificate.  (A copy of the Order is attached hereto as Exhibit 7).

<div align="center">88.</div>

Smith notified the staff of Latimore's assignment as Interim Project Director on October 26, 2010.  Affidavit of Wayne Smith ¶3.

**RESPONSE**:

Admit.  From September 28, 2010, the date Green was suspended, through October 26, 2010, Plaintiff did not know who her immediate supervisor was, despite repeated requests to Smith and others requesting this information.  (Documents supporting same are attached hereto as Exhibit 8).  Plaintiff had no immediate supervisor until Smith made his announcement and decision to appoint Latimore as Acting Project Director.  (Latimore Dep., 75:1-21).

<div align="center">89.</div>

<div align="center">- 38 -</div>

Latimore suspended Plaintiff without pay on October 26, 2010 and recommended her termination to the CMT on November 9, 2010 which was accepted by the CMT at its meeting that day.  Latimore Aff. ¶11, Exh. 3; Peacock Aff. ¶11, Exh. 2.

**RESPONSE**:

**Admit.   Latimore's first action as Plaintiff's supervisor was to suspend her. (Latimore Dep., 50:4-11; 51:13-14).    Plaintiff never returned to work when Latimore was announced as her supervisor and suspended her and then fired her.  (Chaney Dec. at 44).**

90.

Before the decision to recommend terminating Plaintiff's employment was made, the following occurred: Plaintiff sent Latimore an e-mail acknowledging an "unpleasant" confrontation; she sent emails objecting to signing in and providing information related to her many absences to Green's administrative assistant; she had to be asked three times to turn in her time sheets; she sent emails demanding a job description, an employee handbook, and to be told who her supervisor was in Green's absence; she missed several days of work despite being told that important meetings were scheduled for those days; she claimed she was ill but admitted that she did so because of the job.  Latimore Aff. ¶8, Exh. 2; Chaney Depo., pp. 293-294.

**RESPONSE**:

**Plaintiff objects to DSMF #90 because it violates the Local Rules by having more than one fact under a single number.  If the Court chooses to consider each fact contained in DSMF #90, Plaintiff responds as follows:**

**Fact One: "Unpleasant" confrontation:  Deny.  There is nothing in the record of an email that contains the word "unpleasant confrontation" as "Exhibit 2" to Latimore's Affidavit.  There is an email from Plaintiff to Rod Green about a "hostile encounter" with**

Michelle Slaton about Plaintiff's absence.  A copy of this email is attached hereto as Exhibit 9.

**Fact Two**: Signing in and absences:  Deny.  There are several emails that show where Plaintiff explained that the office closed before she could get her timesheets submitted and asked who to submit them to because she had learned Green had been suspended.  (See, Exhibit 10).  Plaintiff admits that she did not want to share her private health information with Slaton.  There are several emails about her absences attached in Exhibit 10 as well.

**Fact Three**: Timesheets:  Deny.  See response above about timesheets and signing in.

**Fact Four**:  Job Description & Handbook:  Admit.  Plaintiff was not told who her supervisor was until October 26, 2010; she was never provided with a handbook because Smith told her one did not exist.  (See, Exhibits 8 & 11).

**Fact Five**:  Missing work and illness:  Deny.  Plaintiff missed work because of illness and other emergencies, and provided information each time to Green regarding her absences.  (Chaney Dec. at ¶ 22).  Green excused her absences.  (**Id**.).  Plaintiff also informed Latimore and Smith of her absences.  (Chaney Dep., p. 293).  (See, Exhibit 12).  Plaintiff never said she missed work because of the job and not illness.  (Chaney Dep., p. 293; 294:1-17).  In addition, please see Plaintiff's response to DSMF #91.

91.

Before making the decision to recommend terminating Plaintiff's employment, Latimore asked her to come to the office to meet with him to talk about how she could improve her performance and retain her job but she refused to do so, claiming that she had a medical excuse which she never provided.  Latimore Depo., pp. 54, 56; Chaney Depo. p. 294.

**RESPONSE**:

**Deny.  Plaintiff was sick and under a doctor's care.  (Chaney Dep., 293:12-5-20).**
**Plaintiff did not provide a medical excuse because she explained during her deposition that**
**it had always been Green's policy for her to provide a medical excuse upon her return, and**
**she was going to give Latimore a medical excuse upon her return, but he had called and**
**suspended her and then terminated her employment before she could provide the excuse.**
**(Id., 294:7-14).**

**In regards to the contention in DSMF #91 that Latimore wanted to talk to her about**
**how she could improve her performance, Plaintiff denies this is the case because until**
**October 26, 2010, Latimore was not Plaintiff's supervisor, so besides calling her to suspend**
**her, there could be no other reason for him to want to meet with her.  (Chaney Dec. at ¶ 44).**
**Moreover, during the telephone conversation with Latimore, he told Plaintiff he had already**
**mailed her a letter advising her that she had been suspended.  (See, the letter and Plaintiff's**
**response to being notified of her suspension attached hereto as Exhibit 13).**

92.

Latimore made the decision to terminate Plaintiff's employment for the reasons outlined
in ## 90-91 above and ##93-97 below.

**RESPONSE**:

**Plaintiff objects to this Fact has not being supported by any evidence and refers to**
**seven different paragraphs without any cites.  Therefore, Plaintiff denies DSMF # 90, 91, 93,**
**94, 95, 96 & 97.  For detailed reasons why Plaintiff denies these facts, please see Plaintiff's**
**responses to DSMF # 90, 91, 93, 94, 95, 96 & 97.  A copy of Plaintiff's termination letter is**
**attached hereto as Exhibit 17.**

93.

While working as Latimore's FSA, Plaintiff was argumentative, confrontational, unpleasant, and challenged many of his decisions, just as she had with Bernard on a regular basis and as she had also done with one of the school counselors during CRCT testing—a process with which she had no previous experience.  Latimore Depo., pp. 10-11, 16, 19-20, 35-37, 42, 46-49, 54; Latimore Aff.¶¶7-8, Exhs. 1-2; Affidavit of Eloise Coleman, ¶4.

**RESPONSE**:

**Plaintiff objects to this Fact as containing more than one factual statement under the same numbered paragraph.  If the Court chooses to consider DSMF#93, Plaintiff responds as follows:**

**Fact One:  Deny.  Plaintiff worked as Latimore's FSA for eight days.  (Chaney Aff at ¶ 44).  There is one email exchange between them in which they had a misunderstanding, but that was the extent of it.  (See, Doc. 41-15).**

**Fact Two:  Deny.  During the CRCT, Coleman explained the processes used at Taylor County to proctor a standardized test.  (Chaney Dec. at ¶ 21).  Coleman then asked Plaintiff if Houston County used the same processes, and Plaintiff responded "no", and went on and explained the differences.  (Id.).  Plaintiff did not suggest that Coleman do things as Houston County had done, she was merely responding to a question asked.  (Id.).  Coleman mistakenly considered her response as "insubordination."  (Id.).**

94.

Plaintiff's attendance was poor; when she was nominally present at work, she was rarely in her office and difficult to find when needed.  Latimore Depo., pp. 33-34, 50, 54, 55, 57; Latimore Aff.¶11, Exhs. 2 and 3.

**RESPONSE**:

**Deny.  Plaintiff's absences were all excused and there are documents to confirm Green excused my absences.  (Chaney Dec. at ¶ 22).  In regards to Plaintiff's whereabouts being unknown, there were several times that Plaintiff had to wait in the teacher's lounge at the primary school because Bernard would not give Plaintiff a key to the office.  (Id.).  When Plaintiff's office was at the elementary school, Plaintiff had two cellular phones and was easily accessible.  (Id.).  After Plaintiff was moved to the high school, she shared an office with two others on a full time basis and a police officer on a part time basis.  (Id.).  Plaintiff was down the hall from Latimore's office and he could easily stop by her office to find her. (Id.).  On Plaintiff's first day at the high school, no other SS/HS staff member was in the office and Plaintiff could not locate Harris to get a key, so Plaintiff had to sit in her car and wait.  (Id.).  An email from Harris stating same is attached hereto as Exhibit 14).**

<div align="center">95.</div>

Plaintiff was unable or unwilling to submit the documentation and records on a timely basis which she was responsible for submitting to Norris Consulting and the ISRs she did submit showed minimal contact with students and the families in the program in contrast to the quantity and quality of the ISRs that the other FSA, Valerie Harris, regularly submitted.  Latimore Depo. p. 54; Latimore Aff. ¶11, Exh. 3; Norris Aff. ¶¶7-12, Exhs. 6-11.

**<u>RESPONSE</u>**:

**Deny.  Plaintiff submitted three quarterly reports.  (Chaney Dec. at ¶ 23).  Plaintiff was at fault for turning in one quarterly report late.  (Id.).  Another of her reports was turned in on time.  (Id.).  The final report was late due to high school grade deadlines and fall break. (Id.).  Latimore was aware ahead of time that this report was going to be late and approved it being late.  (Id.) (See, October 6, 2010 memo to Plaintiff from Latimore attached hereto as**

Exhibit 15).  **Plaintiff submitted her final quarterly report on October 21, 2010, which was her last active day at work.  (Id.).**

**Plaintiff had very few contacts with students because Bernard would not allow her to see the kids when she counseled them.  (Chaney Dec. at ¶ 8).**

96.

Plaintiff was unable to get along with staff members, including Valerie Harris, as well as Bernard who Latimore believed was doing a professionally competent job of counseling students. Latimore Depo. pp.36-37,54; Latimore Aff. ¶¶ 4-6; Bernard Aff. ¶3, Exh. 2; Harris Aff. ¶15, Exh. 11.

**RESPONSE**:

**Deny.  Plaintiff did not have a problem with Harris and got along with Harris. (Chaney Dec. at ¶ 24).  Plaintiff's issues with Bernard have been addressed in previous responses regarding her wait-listing black students, so it's Latimore's opinion if he thought she was competent in performing her job.**

97.

Before making his decision to recommend to the CMT the termination of Plaintiff's employment, Latimore asked both Harris and Bernard to provide him in writing a description of their experience working with Plaintiff.  Latimore Aff. ¶6; Harris Aff. ¶15, Exh. 11; Bernard Aff. ¶5, Exh. 4.

**RESPONSE**:

**Admit**.

98.

Latimore had never seen Plaintiff's complaint to the PSC nor had he been told its contents at the time he made his decision and recommendation regarding Plaintiff's employment.  Latimore Depo. pp. 59-60, 64, 69-70, 72, 117; Latimore Aff. ¶5; Green Aff. ¶11; Smith Aff. ¶4.

**RESPONSE**:

**Deny.  Latimore testified that he didn't recall if he had seen it, but if he was aware of it at the time he terminated Plaintiff, it would be a bad fact in connection with this lawsuit. (Latimore Dep., 88:17-25; 89:1-21; 90:5-8).  Latimore then said he did not know anything about a PSC Complaint until we received the PSC Complaint.  (Id., 90:18-20).  The school system was made aware of the PSC Complaint on September 27, 2010.  (Id., 92:4-7).**

99.

Latimore did not confer with Green in making his decision to recommend termination of Plaintiff's employment.  Latimore Depo., p. 118; Green Aff. ¶11.

**RESPONSE**:

**Deny.  Plaintiff witnessed Green in Latimore's office after Green had been suspended. (Chaney Dec. at ¶20).  Latimore testified that he could not remember if he talked to him the day Chaney was fired.  (Latimore Dep., 114:20-25).  The phone records show that Latimore talked to Green the day Chaney was fired.  (Id., 116:9-14).**

V.     Plaintiff's Complaints

100.

Plaintiff contends that Bernard placed African-American students on a "waiting-list" for counseling even though they had been referred for counseling before various white students. Chaney Depo., p.171.

**RESPONSE**:

- 45 -

**Admit.  Please see Plaintiff's responses to DSMF # 39, 56-60 & 62.**

101.

The only example Plaintiff gave of the waiting list was two white students related to the local police chief who Bernard began counseling immediately after they witnessed an extremely violent episode of domestic violence in their home.  Chaney Depo., pp. 171, 174-176; Bernard Depo., p. 50.

**RESPONSE**:

**Deny.  Another child was wait-listed until Bernard was forced to see her due to teacher complaints, but even then she didn't counsel the child.  (Chaney Dec. at ¶ 25). Lockett testified that she or another teacher had made the referral for the child but did not see any evidence of her behavior improving.  (Lockett Dep., 21:16-25; 22:1-3).  The teacher made the statement that the child was not receiving services from Bernard.  (Id., 22:21-25). The child was not getting any better in the classroom and everybody could see it.  (Id., 23:17-25; 24:1-9).**

102.

Plaintiff contends that the white children referenced in #101 above received counseling even though two African American students who were victims of abuse themselves in the home were not.  Chaney Depo., pp. 174-176.

**RESPONSE**:

**Admit.  In addition, Sandra Lockett told Plaintiff that the eldest of the two African American siblings subject to abuse started acting out on peers at school and Plaintiff told Bernard same. (Chaney Dec. at ¶ 26).  See also, Plaintiff's response to DSMF #101.**

103.

Bernard did not receive a referral from Plaintiff for counseling either of the two African American students referenced in #102 above in 2010; the first referral for counseling was in 2011 and it was only for one of the students and the purpose of the referral was not related to abuse. Bernard Depo., pp. 26-27, 45; Bernard Aff. ¶2.

**RESPONSE**:

**Deny.  Bernard received the referral and told Plaintiff about it.  (Chaney Dec. at ¶ 27).  Bernard told Plaintiff it came from DFCS and was "Diversion."  (Id.).  Plaintiff had no prior knowledge of any of the students in Taylor County and would not know their addresses or have the need to make a home visit and discuss community resources with Green for this family.  (Id.).**

104.

There is an ISR completed by an FSA that shows one of the African American students received services from Plaintiff in April, but there is no indication the student was referred for mental health counseling.  Chaney Depo., Exh. 19, Bates No. Defendants 0841; Bernard Aff. ¶2.

**RESPONSE**:

**Deny.  Plaintiff did not make referrals for kids to receive counseling from Bernard. (Chaney Dec. at ¶ 4).  Bernard received most referrals and reviewed them and decided at**

that time whether or not to provide services. (**Id**.). **If Bernard chose to provide services, she would tell Plaintiff when she had scheduled the parents to come in for the initial assessment so that they could complete her paperwork at the same time. (Id.). If the child was wait-listed or Bernard did not want to provide services, then no assessment was performed and she would have Plaintiff send a letter to the parent informing them that no counseling would be provided. (Id.).**

<div align="center">105.</div>

Plaintiff denied that she completed the ISR on the student referenced in #104 above. Chaney Depo., pp. 142-143.

**RESPONSE**:

**Deny.  Plaintiff testified that she did not remember completing the form, not that she denied she completed the form.  (Chaney Dep., 143:17-25).  Plaintiff does remember having contact with the family and seeking services for them through Green, but that the child was not serviced by Bernard.  (Id., 142:12-19; 143:3-7).**

<div align="center">106.</div>

Plaintiff claims to have sent an email to Green about the students referenced in ##102-105 above in April of 2010 but the email makes no reference to a need for mental health counseling or a refusal by Bernard to provide it.  Chaney Depo., p. 160, Exh. 20.

**RESPONSE**:

**Admit.  Plaintiff sent the email.  Even if the email does not mention a refusal by Bernard to provide counseling, Plaintiff talked with Green about this family and Green had not done anything about the kids.  (Chaney Dep., 160:5-25; 161:1-19).  Other school authorities had reported problems with these kids as well, but Bernard refused to accept**

<div align="center">- 48 -</div>

them into counseling.  (<u>Id.</u>, 160:8-20; 161:15-19).   Green was aware that Bernard was not servicing these kids and Plaintiff kept him abreast of new issues with the siblings as they occurred via email and in fact to face meetings.  (Chaney Dec. at ¶ 27).

107.

As an FSA who suspected a student was abused or neglected, Plaintiff had a responsibility to make the referral to the School District's social worker, Joyce Kennan, so that a referral to DFACS could be made if she suspected abuse or neglect.  Bernard Depo., p. 49.

<u>RESPONSE</u>:

**Deny.  Plaintiff had never heard of Joyce Kennon until this lawsuit. (Chaney Dec. at ¶ 6).  Green told Plaintiff to tell him not an outside agency.  (<u>Id</u>. at ¶ 7).**

108.

Because of the number of referrals at the elementary and primary schools, Bernard did have students waiting for her services and determined which students to serve based on the severity of the student's presenting problem.  Bernard Depo. pp. 22, 69-70.

<u>RESPONSE</u>:

**Deny.  Please see Plaintiff's responses to DSMF # 39, 56-60, 62 & 109.**

**Furthermore, in Bernard's Deposition, she claimed to not have anyone waiting on her services anymore, so it is possible to not have children on wait-lists for her services, but at the time of Plaintiff's employment, she had several.  (Bernard Dep., 21:21-25).  Bernard currently services 60 students and serviced more than 40 when Plaintiff worked with her. (Bernard Dep., 16:25; 17:1-8).**

109.

Both white students and black students were waiting for Bernard's services.  Bernard Aff. ¶6; Deposition of Sandra Lockett, pp. 6,19.

**RESPONSE**:

**Admit.   However,  mostly  black  students  were  waiting  for  Bernard's  services. (Chaney Dec. at ¶ 14).  Lockett even testified that she reported to the assistant principal and the principal that there appeared to be a racial disparity regarding the number of black kids on the waiting list because more blacks were on the list than whites.  (Lockett Dep., 6:21-25; 7:1; 25:4-6).  Lockett believes that at one point Chaney may have been "in the midst"/ "in the office" when a discussion took place of the number of black kids on the waiting list.  (Id., 7:7-17).**

**Also, please see Plaintiff's responses to DSMF #39, 56-60 & 62.**

110.

Plaintiff complained that a six year old African American male student, S.S., accused Bernard of favoring a white female student during a group therapy session and objected to Bernard's reaction to the boy's allegation which Plaintiff claimed was to propose dismissing him from counseling.  Chaney Depo., pp. 173-174.

**RESPONSE**:

**Deny.  Bernard told Plaintiff of his accusation of calling her a racist.  (Chaney Dec. at ¶ 11).  (Chaney Dep., 173:15-25; 174:1-8).  The boy was not six years old; he was in the third grade.  (Id.).  When Bernard invited Plaintiff to sit in a session with him and Plaintiff disagreed with Bernard, Plaintiff was never invited to any future sessions with any of the students.  (Id.).  Plaintiff witnessed Bernard touch the white girl when she got something right, but would not touch the black boy and that is when the black boy called Bernard a**

**racist because of the hugging of the white girl and giving treats to the white girl, but not doing the same for the black boy.  (Chaney Dep., 173:22-25; 174:1-8).  Plaintiff told Bernard that it seemed she was definitely more comfortable with the white female than the black male.  (Chaney Dec. at ¶ 12).**

<div align="center">111.</div>

Bernard told Latimore that when S.S. did not get his way, he would tell Bernard that she liked a white female child better than she liked him because the she was white.  Bernard Depo., pp. 18-20.

**<u>RESPONSE</u>:**

**Admit that is what Bernard testified to, but deny her version of events.  Bernard claims Latimore told her to stop seeing him.  (Bernard Dep., 19:9-11).  Bernard is still counseling him.  (<u>Id</u>., 20:13-21). Further, Latimore did not become involved until Plaintiff told Green about what was happening with S.S.  (Chaney Dec. at ¶ 12).**

**In addition, Plaintiff witnessed her appearing to favor the white female over the black male and suggested she be mindful of this.  (<u>Id</u>.).  Plaintiff told her there was a disparity in treatment.  (<u>Id</u>.).**

<div align="center">112.</div>

Bernard believed that S.S. was using the allegation referred to in ##110-111 above to manipulate her.  Bernard Depo., pp. 18-20.

**<u>RESPONSE</u>:**

**Deny.  Please see Plaintiff's responses to DSMF #110 & 111.  Later in her deposition, she testified that her and Latimore decided to go ahead and leave him in counseling and that**

<div align="center">- 51 -</div>

the child was open and it was not an issue of him using race as manipulation.  (Bernard Dep., 21:1-6).

Also, please see Plaintiff's response to DSMF #110 & 111.

113.

Although Latimore suggested that S.S. be dismissed from the program, Bernard continued the counseling which is continuing to the present.  Id.

**RESPONSE**:

Deny.  Bernard testified that she and Latimore decided to continue with counseling.  (Bernard Dep., 20:22-25; 21:1-2).  Latimore did not become involved until Plaintiff told Green about what was happening with S.S.  (Chaney Dec. at ¶ 12).

114.

Plaintiff also objected to Bernard recommending to the parent of an African American female student that she be evaluated by a pediatrician rather than allegedly refuse to provide her with counseling.  Chaney Depo., p. 177.

**RESPONSE**:

Admit.  When Bernard would be in that child's presence, she would stammer and stutter because the child would refuse to do what Bernard wanted her to do and Bernard would just tell the child to lay on the floor.  (Chaney Dep., 172:11-13) (Chaney Dec. at ¶ 28).  Moreover, Bernard is not supposed to tell anybody that the child needs medication and that's why the child cannot be accepted into the program.  (Chaney Dep., 177:12-20).  Plaintiff disagreed with Bernard not following policy when deciding what kids were allowed to be a part of the program.  (**Id.**, 177:22-25).

115.

Bernard did recommend the student referenced in #114 above receive a pediatric evaluation based on the severity of her behaviors but she did not refuse to counsel her and in fact provided counseling to this student for two and a half years.  Bernard Depo., pp. 43-44.

**RESPONSE**:

**Deny.  Bernard did not counsel N.  (Chaney Dec. at ¶ 28).  Bernard never even attempted counseling until she suggested medication and a physician's attention.  (Id.).**

116.

Plaintiff believed Bernard was not competent to counsel both African American and white students.  Chaney Depo., pp. 171-177.

**RESPONSE**:

**Deny.  Plaintiff testified that the children Bernard counseled, both white and black, were submissive.  (Chaney Dep., 172:7-10).  The children Bernard had a problem with were the ones who questioned her and they included both races.  (Id., 172:13-15).  However, the difference was that she just would not treat the black kids.  (Id., 172:15-20).**

**When asked during her deposition if Plaintiff disagreed with how Bernard counseled the students, Plaintiff flat out denied the statement and testified that she disagreed with Bernard not following policy about the children that she did take into the program.  (Chaney Dep., 177:1-8).**

B.     Incident on Bus

117.

Taylor County students in the SS/HS program were offered the opportunity to participate in a summer camp program entitled Youth Energized to Succeed or Y.E.S. at Fort Valley State

University ("FVSU") through a contract between the SS/HS initiative and FVSU.  Green Aff.¶12, Exh. 6.

**RESPONSE**:

**Admit.**

118.

The FVSU faculty member responsible for implementing the contractual obligations for the Y.E.S. program was Dr. Meigan Fields, Associate Professor of Political Science.  Deposition of Dr. Meigan Fields, pp. 5, 22-23.

**RESPONSE**:

**Plaintiff objects that this Fact is not supported by the cited evidence.  Dr. Fields testified that she was the principal investigator for the SS/HS Grant and said nothing about the contractual obligations for the Y.E.S. program.  (Fields Dep., 5:10-12). Furthermore, Nurse Nobles testified that Dr. Fields did not have a contract with the infirmary.  (Nobles Dep., 68:12-15).**

119.

Sometime in July, Plaintiff notified Dr. Fields that a fourteen year old female student performed oral sex on two male students, one who was 14 and the other 16, while riding the bus back to Taylor County from the camp.  Fields Depo., p. 5; Harris Aff., Exhs. 7-10.

**RESPONSE**:

**Plaintiff objects to any evidence cited from Harris' Affidavit as she has no personal knowledge about any of the information contained in this Fact.**

**Subject to same, Plaintiff denies that she was the one that told Dr. Fields about the sexual acts on the bus and that Dr. Fields was the one that told Plaintiff.  (Chaney Dep., 208:9-14).  Moreover, the student did not "perform" oral sex, but was forced.  (Id., 221:2-5).**

120.

Plaintiff brought the female student to Dr. Fields who arranged for the student to meet with a nurse at the university's infirmary.  Fields Depo., p. 6.

**RESPONSE**:

**Deny.  Fields met Plaintiff so that they could go and talk to the student together.  (Chaney Dec. at ¶ 30).  After they talked to the student, Dr. Fields instructed Plaintiff to take the student to Nurse Nobles and the three of them went to see Nurse Nobles.  (Id.).**

121.

Plaintiff and Dr. Fields accompanied the student to the infirmary and were present during the student's meeting with the nurse.   Fields Depo., p. 6; Deposition of Joann Nobles, p. 13.

**RESPONSE**:

**Deny.  Dr. Fields stepped in initially, but then received a phone call during the interview and left and then the remainder of the interview the only persons present were Plaintiff, the student and Nurse Nobles.  (Nobles Dep., 6:8-9; 9:15-25; 13:18-24; 14:1-6).**

122.

Dr. Fields stated the student admitted participating in the sexual conduct but she did not indicate in any way that she was "forced" to do so or that she did so involuntarily.  Fields Depo., pp. 8-9, 22, 26.

**RESPONSE**:

**Deny. Nurse Nobles testified the girl said she was forced and did not do it on her own and that she informed Dr. Fields of same. (Nobles Dep. 7:14-19; 11:1-5; 41:7-20). Nobles said she made it clear to Dr. Fields that the student had been forced to engage in oral sex and had not wanted to do it before her head was forced down into the boy's lap. (Id., 11:22-25; 12:1-2). The student said she was forced to do it and didn't want to do it. (Chaney Dep., 221:4-5).**

**When Plaintiff and Fields interviewed the student before taking her to the nurse, the student said she was forced and put her hand on her head to show how she was forced down to perform oral sex. (Chaney Dec. at ¶ 32). Fields also heard the student say forced when the student told of the incident to Green, Fields and Plaintiff. (Id.).**

123.

The nurse claims that the student said one of the boys placed his hand on her head and pushed it in the direction of his genitals and that she willingly participated in the act with the other boy. Nobles Depo., pp. 6-8.

**RESPONSE**:

**Deny. Plaintiff objects that Defendants have misrepresented the testimony of Nurse Nobles and that nowhere in her depositions does she say that the student "willingly participated in the act with the other boy." However, Nurse Nobles did say that the student said one of the boys placed his hand on her head and pushed it in the direction of her genitals. Please see Plaintiff's responses to DSMF #119-122.**

124.

Nothing the student said led the nurse to believe that she was obligated as a "mandatory reporter" under Georgia's Child Abuse Reporting Statute, O.C.G.A. § 19-7-5, to make a report to

DFACS or law enforcement because she did not have sufficient information to do so.  Nobles Depo., pp. 36, 49.

**RESPONSE**:

Admit.  Nurse Nobles went on to explain that she would have reported it under different circumstances and if the student had not been under the authority of Plaintiff, Dr. Fields, and Taylor County.  (Nobles Dep., 39:9-12).  Nobles felt like they (Taylor County) were going to handle the situation and would report it.  (Id., 39:13-15; 69:12-21).  Nobles did not report it to DFACS because the girl did not live in her county and she thought she was going to be taken to the county that was going to handle it.  (Id., 42:1-7).

Additionally, Amy Thomas, Houston County victim advocate, testified that she was told that the bus incident was going to be handled some other kind of way and that something would be set up later.  (Thomas Dep., 7:14-20).

125.

The nurse did not prepare any kind of patient chart as she would have done if a summer camper had visited the infirmary for treatment of simple injuries.  Nobles Depo., pp. 15, 40, 67-68.

**RESPONSE**:

Admit.  Nobles testified that she did not create a chart because she was not a student. (Nobles Dep., 15:7-9).

126.

Plaintiff claims that the student told Green that she was raped and forced, at which point Green, a former GBI agent, began to interrogate her so as to get her to change her story.  Chaney Depo., pp. 228-232.

**RESPONSE**:

**Admit.   Green initially allowed the student to tell her story without interruption. (Chaney Dep., 229:22-25).  Then he excused the student from the room and told Plaintiff and Dr. Fields that he could get it out of her, but they would not like the way he did it.  (Id., 229:8-11).   Green called the female student back in and interrogated her.   (Id., 229:11-25).   The student started crying and Green went on to tell the student that the boys were some popular boys and one of them played football.  (Id., 230:1-3; 231:10-24).   Green then asked the student, "isn't it kind of true that, you know, you might want the attention?"  (Id., 231:24-25).   Green went on to say something to the effect of, "didn't you want to do it for one of them and maybe not the other?"  (Id., 232:1-4).  He asked her, "isn't it true you might like the attention?" (Id., 232:8-9).  Once he got the student to admit that she liked one of the boys but not the other, he then sent her out of the room and started calling in other kids who were present on the bus that day.  (Id., 232:9-15).   The only time Plaintiff and Dr. Fields were not present when Green interviewed the other students was when Green interviewed his cousin. (Id., 233:2-21).**

<div align="center">127.</div>

Plaintiff made no allegation in her complaint to the PSC regarding Green's alleged interrogation of the female student.  Chaney Depo., Exh.22.

**RESPONSE**:

**Admit.  Plaintiff complained about Green's handling of the bus incident overall and gave a general summary of the incident and did not put everything in there.  (Chaney Dep., pp. 197-202).**

<div align="center">128.</div>

Dr. Fields and Green both testified that Green did not interrogate her at all.  Fields Depo., pp. 7-8, 15, 42; Green Depo., pp. 76-78, 89, 110-112.

**RESPONSE**:

**Deny.  Please see Plaintiff's response to DSMF #126.**

**In addition, the student's mother, stated under oath that Green told her he had asked her child "once and she said no, but when he asked her again, she agreed."  (Burk Aff. at ¶ 4).  Furthermore, Green later changes his testimony and testifies that what the student told her mother was "very consistent with what she had said to me" when he was in the room with Plaintiff, Dr. Fields, and the student.  (Green Dep., 159:1-3).**

129.

Dr. Fields asked the student questions about the incident while Green left Fields' office because of the sensitive nature of the subject.  Fields Depo., p. 7; Green Depo., pp. 77-78.

**RESPONSE**:

**Deny.  Please see Plaintiff's response to DSMF #126 & 128.**

**The only time Dr. Fields asked the student about the incident was before Nurse Nobles was called and before Green was called.  (Chaney Dec. at ¶ 30).**

**Furthermore, Green later changes his testimony and testifies that what the student told her mother was "very consistent with what she had said to me" when he was in the room with Plaintiff, Dr. Fields, and the student.  (Green Dep., 159:1-3).**

130.

Both Dr. Fields and Green agree that the student did not, in their presence, suggest that she was in any way forced to engage in the acts.  Fields Depo., pp. 8-9, 22, 26; Green Depo., pp. 81-85.

**RESPONSE**:

**Deny.  Nurse Nobles told Dr. Fields that she felt like from her conversation with the student she was forced to perform the act.  (Nobles Dep., 43:4-25).  Moreover, when Green allowed the student to tell her story uninterrupted in Fields' office, the student mentioned the words "forced" and "raped."  (Chaney Dep., 229:22-25) (Chaney Dec. at ¶ 32).  Fields was present when these words were used.  (Id.).**

131.

The student told Dr. Fields and Green that she and the boys had planned it earlier in the day when they were swimming in the pool and were, apparently, engaging in other sexual activity. Fields Depo. pp. 8, 14; Green Depo., p. 82.

**RESPONSE**:

**Deny.  One of the kids Green interviewed told them that at the pool, the female student had let one of the boys fondle her in the pool, but not necessarily that she would perform the sex act later on that boy.  (Chaney Dec. at ¶ 33).**

132.

While Dr. Fields and Plaintiff talked with the female student, Green interviewed students who were on the bus in the vicinity of the incident.  Fields Depo., p. 15; Green Depo., pp. 89-91.

**RESPONSE**:

**Deny.  Please see Plaintiff's response to DSMF #126.**

133.

None of the students on the bus told Green that there was any force involved.  Green Depo., pp. 89-91.

**RESPONSE**:

**Deny.  Not all of the students were interviewed; Green testified that he interviewed mainly boys and possibly one girl because boys generally sat in the rear of the bus.  (Green Dep., 89:19-25; 90:1-15).  Green did not take any notes about what any of the witnesses said about the bus incident.  (Id., 86:1-11; 95:17-21).**

**Furthermore, for those Green did interview, Plaintiff heard the students say that the two boys on the bus were pulling the female student back and forth by her wrist, and that it was not on her own free will.  (Chaney Dec. at ¶ 34).**

134.

Green also interviewed the two boys involved in the incident.  Green Depo., p. 86.

**RESPONSE**:

**Admit.   However, Green did not interview the two boys on the same day he interrogated the female student.  (Chaney Dec. at ¶ 35).  Green did not expect talking with the boys' parents would go very far because one of the boy's father was a volunteer basketball coach, but seemed to care very little for his child and the other boy's mother and grandmother were not active in his life.  (Id.).**

135.

Both male students admitted the sexual contact but both denied any force.  Green Aff. ¶13.

**RESPONSE**:

**Admit.  However, Green told the female student's mother that only one boy was involved with the bus incident.  (Burk Aff. at ¶ 4).  Chaney told the mother there were two boys involved and she told Plaintiff that Green had only told her about one boy, not two.  (Chaney Dec. at ¶36).  Moreover, the female student said she was forced and so did Nurse Nobles.  (Response to DSMF #119, 122 & 123).**

Also, please see Plaintiff's response to DSMF #133.

Regardless of whether or not the boys denied any force, Green was aware that having any kind of sex under the age of fifteen is a crime in Georgia and that the female student was fourteen year's old at the time of the bus incident.  (Green Dep., 85:3-11).  It's Green's understanding he is mandated to report it to law enforcement.  (Id., 87:16-19).  Even though both male students admitted sexual contact, Green did not report either of them.  (Id., 86:16-25).

136.

Green brought the female student home in order to inform her mother about the incident. Green Depo., pp. 157-158.

**RESPONSE**:

Deny.  Green took her home because she missed the bus.  (Chaney Dec. at ¶ 37). Furthermore, please see Plaintiff's response to DSMF #135.

137.

Upon learning of her daughter's conduct which she understood was only with one student, the mother asked her if she had been forced to participate in the incident but she denied that she had been forced and admitted it was voluntary.  Green Depo., pp. 158-159; Affidavit of Mable Burk ¶4.

**RESPONSE**:

Admit.  The student's mother thought the sexual conduct was with only one student because Green told her that only one boy was involved.  (Burk Aff. at ¶ 4) (Chaney Dec. at ¶ 36).  In contrast, Green testified that he told the mother about both boys.  (Green Dep.,

**159:25; 160:1-2).   Therefore, Plaintiff objects that the citation to Green's deposition testimony does not support the stated fact.**

138.

The student's mother told Green that because her daughter had admitted the sexual encounter and that it was voluntary, she did not want anyone to get in trouble.  Burk Aff. ¶5.

**RESPONSE**:

**Admit.  However, at the time, Burk did not realize two boys were involved.  (See, Plaintiff's response to DSMF #137).**

139.

The student's mother told Green that the student had a history of sexual abuse and had been placed in her home several years before for that reason.  Green Depo., pp. 158-159; Burk Aff. ¶5.

**RESPONSE**:

**Admit.**

140.

The student's mother asked Green whether the SS/HS program could provide her with counseling and he informed her he would look into it.  Green Depo., pp. 158-159; Burk Aff. ¶5.

**RESPONSE**:

**Admit.  However, Green did not respond to Burk in a timely fashion and she went to Morning Star counseling in Reynolds, GA.  (Chaney Dec. at ¶ 38). When she went to Morning Star, she was told that she needed a referral and she called Green, but he never called her back.  (Id.).  The student's mother told Plaintiff that Green had not set up counseling for her daughter, but was she was seeing Latimore.  (Chaney Dep., 207:19-22).**

141.

Green asked Latimore to contact the student's mother to arrange for an assessment and counseling.  Latimore Depo., pp. 109, 132.

**RESPONSE**:

**Admit that Green may have asked Latimore to contact the student's mother to arrange for an assessment and counseling, but deny that it actually happened.  In October, the student told Plaintiff she had not been receiving counseling and that she was in the same classroom with one of the boys from the bus.  (Chaney Dep., 206:15-24).  The student told Plaintiff that Latimore knew she was still in the classroom with one of the boys. (Chaney Dec. at ¶ 39).  Plaintiff told Latimore this and he told her that he could not counsel her because Taylor County has an abstinence policy and they could not talk about sex in the SS/HS program.  (Id., 207:3-12). Green also told Plaintiff the same thing.  (Id., 209:6-24; 211:16-18).**

<p align="center">142.</p>

The only person who made a report to either law enforcement or DFACS of the incident at FVSU was Green who reported it the day after he learned of it to the Taylor County Sheriff, Jeff Watson.  Green Depo., pp. 128-130; Deposition of Jeff Watson, pp. 19-22, 46-47, 57.

**RESPONSE**:

**Deny.  Green told Plaintiff after she asked about reporting the incident that he still had to figure out where it happened because the bus went through three counties and he had to report it to the right one.  (Chaney Dec. at ¶ 40).**

**Green eventually reported it to Core Management Team Member, Sheriff Watson, and when he reported it, he left out that there were two males involved and that one of the males had been in the YDC for child molestation.  (Watson Dep., 4:23-25; 5:1-2; 25:1-5).**

Green also did not mention anything about the student saying she was forced to engage in the sexual act.  (<u>Id</u>., 47:3-17).  Green did not make a written report.  (<u>Id</u>., 46:21-22).

Furthermore, there were many conversations about the bus incident; and every time Plaintiff would bring up counseling for the girl and about if it had been reported.  (Chaney Dep., 210:15-23; 211:1-13).  Plaintiff was concerned that Green did not report it and was concerned the student was not going to get counseling, so each time they had a conversation about the bus incident, Plaintiff would bring up these two things.  (<u>Id</u>., 211:1-13).

There is nothing in the record to indicate that Green reported this to DFACS, and he admitted that he did not report it to DFACS.  (Green Dep., 128:2-7).

Plaintiff reported the assault to both the PSC and OIG.  (Chaney Dep., 243:15-17).

143.

On July 26, 2010, Valerie Harris completed a referral to the SS/HS program for the female student and wrote in her ISR for that student that she would be referred to mental health for counseling.  Harris Aff. ¶8, Exh. 8.

**RESPONSE**:

Admit.  At the time Harris submitted the ISR, the student had not been receiving mental health counseling even though she had previous ISRs.  (Harris Aff. at ¶ 8).

144.

The student's mother signed a consent form for mental health counseling on August 4, 2010 and a psychosocial evaluation was conducted by Mr. Latimore on that day.  Latimore Depo.,pp. 125-126 ; Burk Aff. ¶6, Exh. 1.

**RESPONSE**:

Admit.  In addition, please see Plaintiff's responses to DSMF #141 & 143.

145.

The female student received mental health counseling from Mr. Latimore at her mother's request from that point through the present.  Latimore Aff. ¶9; Burk Aff. ¶7.

**RESPONSE**:

**Deny.  Please see Plaintiff's response to DSMF #141.  Moreover, even if the female student was receiving counseling, she was not receiving counseling with regards to the bus incident because the SS/HS program did not talk about sex.  (Chaney Dep., 211:16-25; 212:1). The child's mother told Plaintiff she was not seeing Latimore for counseling related to the bus incident.  (Chaney Dec. at ¶ 38).**

146.

The two male students were removed from the remaining days of the summer camp and were not permitted to go on the final field trip to Tuskegee University.  Green Depo., pp. 132-133; Latimore Aff. ¶13.

**RESPONSE**:

**Deny.  The boys were not removed from the program.  (Chaney Dec. at ¶ 41).  One of the boys had quit long before the field trip and the other boy, Plaintiff instructed another counselor, Justin Bryant, to tell him he could not participate in the field trip two days before the trip.  (Id.) (Fields Dep., 33:2-5).**

**Moreover, even if they were removed from the program, Dr. Fields testified that they were dismissed from the program, but not because of the bus incident, but for other things they had done and another counselor removed them.  (Fields Dep., 32:17-25).  The boys were allowed to come back in the program the next summer.  (Id., 5-14).**

147.

One of the male students involved in the bus incident, D.B., had been in counseling with Latimore since February 2009 and after that incident the counseling continued.  Latimore Depo., pp. 109-110.

**RESPONSE**:

   **Admit.  That student had a prior incident of child molestation against another child and Latimore was aware of this.  (Latimore Dep., 98:23-25).  The student told the child he had a past sexual offense and the referral form had the past sexual offense on it as well.  (Id., 99:14-17).  Despite this knowledge, Latimore did not take any extra precautions regarding this student.  (Id., 100:9-13; 105:11-13).  Under Latimore's care, the student assaulted the female student at issue here.**

                                          148.

   D.B. was referred to SS/HS for counseling in February of 2009 by the alternative school and his mother.  Latimore Aff. ¶12, Exh.4.

**RESPONSE**:

   **Admit.**

                                          149.

   Latimore was aware that D.B. was attending the alternative school following an off campus sexual offense in 2008 when he was in sixth grade, but he was not aware of the precise juvenile crime charged.  Id

**RESPONSE**:

   **Deny.  Please see Plaintiff's response to DSMF #147.  In addition, Latimore admits he was aware the student had some involvement with the molestation of a sixth grade student,**

but was not sure if it was molestation for sure.  (Latimore Dep., 103:2-6).  However, Latimore

told Plaintiff that D.B. had been charged with child molestation.  (Chaney Dec. at ¶ 42).

150.

The parent of the other male student involved in the incident refused to give permission for

any counseling.  Latimore Depo., pp. 109-110.

**RESPONSE**:

**Admit.**

151.

Plaintiff did not contact anyone in law enforcement or DFACS to determine whether the

incident had been reported prior to making the allegations about Green in the PSC complaint that

he failed to report the incident on the bus to law enforcement.  Chaney Depo. pp. 243-244.

**RESPONSE**:

**Admit.  Plaintiff was told Green was very close with the DFACS worker, he was**

**related to her or something, and that it would not be safe for her to do.  (Chaney Dep., 243:9-**

**15).  Plaintiff was told that the Sheriff previously worked with Green and that the Sheriff**

**would not be receptive to Plaintiff's complaints.  (Chaney Dec. at ¶ 43).   Plaintiff did,**

**however, report it to the PSC and OIG.  (Chaney Dep., 243:15-17).**

152.

Before alleging in her Complaint in this action that the female student was not receiving

counseling, Plaintiff did not ask Latimore if he was providing counseling to her for the incident.

Chaney Depo., p. 212.

**RESPONSE**:

**Admit.  In addition, please see Plaintiff's response to DSMF #141.**

153.

While Plaintiff was assigned as the FSA at the high school, she had access to the ISR completed by Harris which shows the referral for counseling of the female student because of the incident on the bus.  Latimore Aff. ¶9.

**RESPONSE**:

   **Deny.  Please see Plaintiff's responses to DSMF #141, 143 & 145.**

   **Moreover, Harris did not complete the referral until July 26, 2010 and it was not signed by the principal until August 13, 2010.  (Harris Aff. at ¶ 8).**

154.

Plaintiff did not report the incident of sexual activity among three students on the school bus during a summer camp at FVSU to law enforcement or DFACS.  Chaney Depo. p. 243.

**RESPONSE**:

   **Admit.  Please see Plaintiff's responses to DSMF #142 & 151.**

155.

Dr. Fields, who was in charge of the summer program, did not report the incident referenced in #119 to law enforcement or DFACS.  Fields Depo. pp. 11, 28, 30.

**RESPONSE**:

   **Admit. Dr. Fields did not consider this an incident that needed to be reported.  (Fields Dep., 11:17-23).  Dr. Fields contacted the appropriate people as far as she knew would be her reporting responsibility.  (Id., 28:17-19).**

   VI.   Green's Employment History and Criminal Charges

156.

Green served in the Americus Police Department as a narcotics investigator for five years and as a special agent in the GBI for four years.  Green Aff. ¶4.

**RESPONSE**:

    **Admit.**

<div align="center">157.</div>

Green resigned from the GBI in August 2004, the day after he closed numerous investigative files by placing required paperwork in the files which he had falsified.  Green Depo., pp. 23, 27-28, 31, 39; Green Aff. ¶4.

**RESPONSE**:

    **Admit.**

<div align="center">158.</div>

In May 2005, Green was notified by a lawyer from the Attorney General's office that a criminal investigation had been conducted and that he would be indicted for those actions.  Green Aff. ¶5.

**RESPONSE**:

    **Admit.**

<div align="center">159.</div>

Immediately upon receiving notice of the Attorney General's intent to secure an indictment, Green agreed to plead guilty and did so on July 12, 2005.  Id.

**RESPONSE**:

    **Admit that Green pled guilty to over 60 counts on July 12, 2005, but object to Defendants' characterization that it was "immediately."  (Green Dep., 22:9-16).**

<div align="center">160.</div>

Despite the lawyer from the Attorney General's office recommending a lengthy prison sentence, the Superior Court Judge in Sumter County sentenced Green to ten years probation under Georgia's First Offender Act, O.C.G.A. § 42-8-60, ordered him to complete 500 hours of community service and pay a $6,250 fine.  Green Aff. ¶5; Exh. 2.

**RESPONSE**:

    **Admit.**

<div align="center">161.</div>

Green satisfied all the terms of the sentence and was discharged early from probation on July 27, 2012.  Id.

**RESPONSE**:

    **Admit.**

<div align="center">162.</div>

All of the information about Green's employment at the GBI and his subsequent plea to the criminal charges was known to the members of the Taylor County Family Collaborative in August 2005, when Green was hired to the position in the 21st Century Community Learning Centers program, as well as to the members of SS/HS CMT when they selected him for the position of Project Director three years later.  Peacock Aff. ¶3; Watson Depo., pp. 9-10, 35-36; Smith Depo., pp. 17-18.

**RESPONSE**:

    **Admit.**

<div align="center">163.</div>

Green worked from October 2004 to May 2005 in the Macon County School District at its alternative school.  Green Depo., pp. 20-21; Green Aff. ¶4.

<div align="center">- 71 -</div>

**RESPONSE**:

    **Admit.**

<div align="center">164.</div>

Green was employed in the Macon County School District under a temporary "waiver" of teaching certification requested by that School District's superintendent to the Georgia Professional Standards Commission ("PSC").  Green Depo., pp. 21, 45-46; Green Aff.¶4 Exh. 1.

**RESPONSE**:

    **Admit.**

<div align="center">165.</div>

When the Macon County School District superintendent notified the PSC of Green's guilty plea, the PSC initiated the process of revoking his temporary certification waiver which had, by then, already expired.   Green Aff. ¶ 5.

**RESPONSE**:

    **Admit.  Plaintiff further responds that the PSC still had power to conduct a hearing, even if the certificate had expired and did so in February 2011.  (See, Exhibit 7).**

VII.    <u>Inspector General Investigation</u>

<div align="center">166.</div>

On the same day Plaintiff faxed her complaint to the PSC, she used the "hot-line" for the Department of Education Office of the Inspector General to make complaints about Green and the SS/HS program.   Albritton Aff. Exh. 4.

**RESPONSE**:

    **Deny.  Plaintiff had been in contact with both the PSC and the OIG prior to faxing the complaints in order to find out what issues they handled and what information they**

**needed from her.  (Chaney Dep., 268:7-17).  Plaintiff had written the complaint before she**

**faxed it on September 22, 2010.  (Id., 268:1-7).**

167.

The first notice anyone at the Taylor County School District had of the complaint to the

Inspector General was in early 2011, after the decisions to suspend and terminate Plaintiff were

made.  Albritton Aff. ¶5, Exh. 2.

**RESPONSE**:

**Admit.   Plaintiff contacted OIG in September and met with Special Agent**

**Christopher Maisano in October and began giving him documents.  (Chaney Dec. at ¶ 45).**

**Maisano could not announce his investigation until Joel Hill made his investigation known.**

**(Id.).**

168.

The Inspector General sent an investigator to Butler on January 20, 2011 to interview

School District staff as well as staff employed in the SS/HS program.  Albritton Aff. ¶6; Smith

Aff. ¶4.

**RESPONSE**:

**Admit**.

169.

The Inspector General discontinued the investigation and took no action on Plaintiff's

complaint. Albritton Aff. ¶7, Exh. 4.

**RESPONSE**:

**Admit.**

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION**

| | | |
|---|---|---|
| ERICA CHANEY, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO.: |
| | ) | 4:11-cv-142-CDL |
| v. | ) | |
| | ) | |
| TAYLOR COUNTY SCHOOL DISTRICT, | ) | JURY TRIAL DEMANDED |
| WAYNE SMITH, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**CERTIFICATE OF SERVICE**

I certify that I electronically filed the foregoing **"PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF FACTS"** with the Clerk of Court using the CM/ECF system which will automatically send email or other notification of such filing to the following attorneys of record:

> Phillips L. Hartley, Esq.
> Martha M. Pearson, Esq.
> Harben, Hartley & Hawkins, LLP
> Suite 750, Wells Fargo Center
> 340 Jesse Jewell Parkway
> Gainesville, Georgia  30501

This 3rd day of June, 2013.

<div align="right">

/s/ Meredith J. Carter
Meredith J. Carter
Georgia Bar No. 325422

</div>